**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| MORGAN, LEWIS & BOCKIUS LLP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08 CV 2748 |
| | ) | Judge Pallmeyer |
| CITY OF EAST CHICAGO, | ) | Magistrate Judge Schenkier |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION TO STRIKE THE AFFIDAVIT OF MS. CLARE D'AGOSTINO**

Plaintiff Morgan, Lewis & Bockius LLP ("Morgan Lewis"), by its undersigned attorneys, submits the following Response in Opposition to Defendant the City of East Chicago's ("East Chicago") Motion to Strike the Affidavit of Ms. Clare D'Agostino.

## INTRODUCTION

Clare D'Agostino's ("Ms. D'Agostino") declaration was submitted in support of Morgan Lewis's Motion to Remand on June 5, 2008. (Docket 15, Ex. A.) In support of its Motion to Strike, East Chicago suggests that the averments in Ms. D'Agostino's declaration were not based on her personal knowledge. (Docket 26 at 2-3.) East Chicago further suggests that Ms. D'Agostino's averments "were based upon hearsay statements made by [Charles Lubar] and [Lisa Yano]" in connection with Ms. D'Agostino's preparation of the declaration for this litigation. (*Id.* at 2.)

In so arguing, East Chicago mischaracterizes the basis of Ms. D'Agostino's declaration. As Assistant Counsel to the Firm for Morgan Lewis, Ms. D'Agostino has extensive knowledge regarding Morgan Lewis's partners, including Charles Lubar ("Mr. Lubar") and Lisa Yano ("Ms. Yano"). While Ms. D'Agostino did rely on statements by

Mr. Lubar and Ms. Yano in preparing her declaration, those statements were not the only basis for her averments.

As Ms. D'Agostino testified during her deposition of July 3, 2008, her declaration was based on her review of records maintained by Morgan Lewis in the ordinary course of business. To the extent Ms. D'Agostino relied on Morgan Lewis's business records, her averments regarding Mr. Lubar and Ms. Yano's citizenship and domicile were based on statements that fall within the business records exception to the hearsay rule. Additionally, to the extent Ms. D'Agostino relied on statements by Mr. Lubar and Ms. Yano, her averments regarding their citizenship and domicile, and particularly their intent to remain domiciled abroad, were based on statements that fall within the state of mind exception to the hearsay rule. Because Ms. D'Agostino had sufficient personal knowledge on which to base her declaration, and because the statements on which Ms. D'Agostino relied fall within well recognized exceptions to the hearsay rule, there is no basis for striking her declaration, and East Chicago's Motion to Strike must be denied.

## ARGUMENT

I.    **MS. D'AGOSTINO HAD SUFFICIENT PERSONAL KNOWLEDGE OF MR. LUBAR AND MS. YANO'S STATUS TO SUPPORT HER DECLARATION.**

The substance of the matter contained in an affidavit must be based on personal knowledge. *See, e.g., Cooper v. Lane*, 969 F.2d 368, 372-73 (7th Cir. 1992) (district court was correct to consider affidavit, in that description of incidents and conditions in prison was based on personal knowledge of official who submitted affidavit). Contrary to East Chicago's claim, which conveniently ignores much of Ms. D'Agostino's testimony, Ms. D'Agostino had sufficient personal knowledge of facts concerning Mr.

Lubar and Ms. Yano's domicile and citizenship to support her declaration. East Chicago can offer no reasonable argument to the contrary.

As Ms. D'Agostino testified during her deposition of July 3, 2008, her position at Morgan Lewis as Assistant Counsel to the Firm requires her to be personally familiar with numerous aspects of the firm's partnership. She is, for instance, responsible for assisting Morgan Lewis's partners in resolving risk management and conflict of interest issues, and she provides general assistance to the partnership in the areas of professional responsibility and fiduciary review. (D'Agostino Dep. at 13-14, attached hereto as Ex. A.) She has been doing so for approximately fifteen years. (*Id*. at 11.) Ms. D'Agostino's duties and responsibilities as Assistant Counsel to the Firm also include making disclosures to the United States government that identify Morgan Lewis partners domiciled abroad. In making these disclosures, Ms. D'Agostino must report to the government any foreign ownership interests in the firm, which requires compiling the names and locations of all Morgan Lewis's partners, their citizenship, and the percentage of their ownership. She also must conduct a survey of all Morgan Lewis's partners to ensure Morgan Lewis's compliance with the Foreign Agents Registration Act, which involves, among other things, asking the partners questions pertaining to their citizenship. (*Id*. at 77-78.) In addition to the above, Ms. D'Agostino is required to have firsthand knowledge of where Morgan Lewis's partners are subject to taxation. When a partner is newly admitted to the partnership through a promotion or because the partner has "lateraled in," Ms. D'Agostino fields questions regarding the citizenship of new partners from the department of the firm responsible for partner taxation issues. (*Id.* at 78-79.)

In short, it is Ms. D'Agostino's job to keep track of facts relevant to the precise issues before the Court on Morgan Lewis's Motion to Remand.  To suggest that Ms. D'Agostino lacked sufficient personal knowledge of these facts to prepare her declaration strains credulity.  Accordingly, the Motion to Strike should be denied.

## II.     THE BUSINESS RECORDS ON WHICH MS. D'AGOSTINO RELIED IN PREPARING HER DECLARATION FALL WITHIN THE BUSINESS RECORDS EXCEPTION TO THE HEARSAY RULE.

East Chicago goes to great lengths to suggest that the averments in Ms. D'Agostino's declaration were based primarily on statements made by Mr. Lubar and Ms. Yano to Ms. D'Agostino.  (Docket 26 at 3-6.)  In fact, Ms. D'Agostino relied in large part on records maintained in the ordinary course of Morgan Lewis's business to prepare her declaration.

Rule 803 of the Federal Rules of Evidence sets forth various categories of statements that are not excluded by the hearsay rule, including records "kept in the ordinary course of a regularly conducted business activity."  Fed. R. Evid. 803(6).  A document is admissible under the business records exception to the hearsay rule if (1) it is prepared in the normal course of business, (2) it is made at or near the time of the events it records, and (3) it is based on the personal knowledge of the entrant or the personal knowledge of someone with a business duty to transmit the information to the entrant. *Datamatic Servs. v. United States*, 909 F.2d 1029, 1032 (7th Cir. 1990); *see, e.g., AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1045 (7th Cir. 1990) (data taken from subcontractor's regular business records was admissible as records of regularly conducted business activity); *Pritchard v. MacNeal Hosp.*, 960 F. Supp. 1321, 1325 (N.D. Ill. 1997) (employer's evaluations, warnings, and performance memoranda,

which were made by persons with knowledge of employee's performance and kept in the course of regularly conducted business activity, were admissible under the business records exception).   The records on which Ms. D'Agostino relied in preparing her declaration meet these criteria and fall squarely within the business records exception to the hearsay rule.

Ms. D'Agostino testified in her deposition that she relied on "various systems and databases" that Morgan Lewis has in place in preparing her declaration.  (Ex. A at 60.) Information is fed into those databases to produce, among other things, the biographies of Morgan Lewis's attorneys that appear on Morgan Lewis's website.   (*Id*.)   Ms. D'Agostino stated that various pieces of information on Mr. Lubar's website biography assisted in the preparation of her declaration, including the description of Mr. Lubar's status as a partner in Morgan Lewis's London office, the London office contact information for Mr. Lubar, the description of Mr. Lubar's practice as handling inbound work to the United Kingdom, the description of Mr. Lubar's status as a Registered Foreign Lawyer, and the fact that Mr. Lubar opened Morgan Lewis's London office in 1981.  (*Id*. at 63.)  Ms. D'Agostino further testified that various pieces of information on Ms. Yano's website biography assisted in the preparation of her declaration, including the Tokyo office contact information for Ms. Yano, the fact that Ms. Yano speaks Japanese, the fact Ms. Yano has practiced law in Tokyo for more than 15 years, the description of Ms. Yano's representation of Japanese companies, the description of Ms. Yano's status as a Visiting Professor at the Tokyo School of Law, and the description of Ms. Yano's status as a Registered Foreign Lawyer.  (*Id*. at 64.)  In addition, Ms. D'Agostino testified that her declaration was based on her review of invoices for Mr. Lubar and Ms. Yano's

licensing in various jurisdictions.  (*Id.* at 66.)  Finally, as mentioned, Ms. D'Agostino noted that her duties and responsibilities as Assistant Counsel to the Firm include making disclosures to the United States government that identify Morgan Lewis partners domiciled abroad.  In making those disclosures, Ms. D'Agostino compiles the names and locations of all Morgan Lewis's partners, their citizenship, and the percentage of their ownership interest in the firm.  She also conducts a survey of the partners that asks questions pertaining to their citizenship.  (*Id.* at 77-78.)

The sources described above—the information from the computer systems and databases, the website biographies, the licensing information, and the disclosure documentation—all constitute records that fall within the business records exception to the hearsay rule.  Because those records would be admissible in court, the evidentiary basis of Ms. D'Agostino's declaration is more than sufficient to withstand East Chicago's Motion to Strike.

**III.  THE STATEMENTS OF MR. LUBAR AND MS. YANO ON WHICH MS. D'AGOSTINO RELIED IN PREPARING HER DECLARATION FALL WITHIN THE STATE OF MIND EXCEPTION TO THE HEARSAY RULE.**

Ms. D'Agostino did rely, in part, on statements by Mr. Lubar and Ms. Yano in preparing her declaration.  (Ex. A at 69-74, 79-80, 82.)  This should come as no surprise, as Ms. D'Agostino simply was acting diligently to confirm the information set forth in her declaration.  Those statements, which were elicited either in e-mail, voice mail, or telephone communications with Mr. Lubar and Ms. Yano, confirmed their intent to remain domiciled in London and Tokyo, respectively.  (*Id.* at 69, 73-74, 79-80.)

Under Rule 803(3) of the Federal Rules of Evidence, statements "of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as

intent, plan, motive, design, mental feeling, pain, and bodily health)" are not excluded by the hearsay rule. Fed. R. Evid. 803(3). For a statement to be admissible under the state of mind exception to the hearsay rule, the statement must be contemporaneous with the mental state sought to be proven, (2) it must be shown that the declarant had no time to fabricate or misrepresent his thoughts, and (3) the declarant's state of mind must be relevant to an issue in the case. *U.S. v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1990); *see, e.g.*, *United States v. Hughes*, 970 F.2d 227, 234 (7th Cir. 1992) (declarant's statement of his intent to go to a particular location to procure drugs was admissible under state of mind exception to the hearsay rule because it was offered to show then existing state of mind and was relevant to the theory of the defense); *Contreras v. City of Chicago*, 920 F. Supp. 1370, 1377 n.2 (N.D. Ill. 1996) (proffered testimony concerning declarant's statements regarding Mexican people was admissible as statement of declarant's then-existing state of mind to show the declarant's discriminatory intent).

Mr. Lubar and Ms. Yano's statements to Ms. D'Agostino regarding their intent to remain, respectively, in London and Tokyo qualify as statements of their intent for purposes of Rule 803(3). Mr. Lubar and Ms. Yano's intent clearly is relevant to the issue of their domicile; there is no reason to believe they misrepresented their thoughts in their exchanges with Ms. D'Agostino (*see* Ex. A at 82-83); and because the statements were made in response to direct inquiries by Ms. D'Agostino, they can be classified as descriptions of the current mental states of Mr. Lubar and Ms. Yano. Thus, in addition to the fact that Ms. D'Agostino's personal knowledge and reliance on Morgan Lewis's business records obviates the basis for East Chicago's Motion to Strike, the statements

that East Chicago claims are inadmissible hearsay fall within the state of mind exception to the hearsay rule.

## IV.     THE DOCUMENTS MORGAN LEWIS HAS PRODUCED IN REPONSE TO EAST CHICAGO'S REQUESTS FOR PRODUCTION OF DOCUMENTS PROVIDE A SUFFICIENT BASIS FOR GRANTING MORGAN LEWIS'S MOTION TO REMAND.

Even assuming the Court were to grant East Chicago's Motion to Strike Ms. D'Agostino's declaration, striking the declaration would not warrant the denial of Morgan Lewis' Motion to Remand.  The numerous documents Morgan Lewis has produced in response to East Chicago's Request for Production of Documents more than adequately substantiate Morgan Lewis's assertions that Mr. Lubar and Ms. Yano are United States citizens domiciled abroad.  Those documents include Mr. Lubar and Ms. Yano's passports, driver's licenses, tax returns, bar registration statements, bank account statements, and various documents evincing their ownership of property in London and Tokyo.  (Excerpt from Morgan Lewis's Responses and Objections to Defendant's First Requests for Production of Documents at 3-7, attached hereto as Ex. B.)  Morgan Lewis also has provided Mr. Lubar's certificate of naturalization as a British citizen and Ms. Yano's certificate of alien registration.  (*Id.*)  Separate and apart from Ms. D'Agostino's declaration, these documents make it unmistakably clear that Mr. Lubar and Ms. Yano are United States citizens domiciled abroad.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, Morgan Lewis respectfully requests that the Court enter an order denying East Chicago's Motion to Strike the Affidavit of Ms. Clare D'Agostino, and granting any further relief the Court deems just.

Dated: July 22, 2008                                    Respectfully submitted,


                                                        /s/ Tina B. Solis
                                                        One of the Attorneys for
                                                        MORGAN, LEWIS & BOCKIUS
                                                        LLP

                                                        F. Thomas Hecht (ARDC #1168606)
                                                        Tina B. Solis (ARDC #6242461)
                                                        Seth A. Horvath (ARDC #6283110)
                                                        Ungaretti & Harris LLP
                                                        3500 Three First National Plaza
                                                        Chicago, Illinois 60602
                                                        Telephone (312) 977-4400
                                                        Facsimile (312) 977-4405

## SERVICE OF DOCUMENTS BY ELECTRONIC MEANS

I, Tina B. Solis, an attorney, certify that service of this document was accomplished pursuant to ECF on all Electronic Filing Users of record this 22nd day of July 2008.

                                                        /s/ Tina. B. Solis

# EXHIBIT A

1          IN THE DISTRICT COURT OF THE UNITED STATES

              FOR THE NORTHERN DISTRICT OF ILLINOIS

2                     EASTERN DIVISION

3

    MORGAN, LEWIS & BOCKIUS LLP,       )

4                                      )

                  Plaintiff,           )

5                                      )

           -vs-                        ) No. 08 CV 2748

6                                      )

    CITY OF EAST CHICAGO,              )

7                                      )

                  Defendant.           )

8

9

10          Deposition of CLARE D'AGOSTINO via telephone, taken

11   before DONNA L. POLICICCHIO, C.S.R., and Notary Public,

12   pursuant to the Federal Rules of Civil Procedure for the

13   United States District Courts pertaining to the taking of

14   depositions, at 200 Russell Street, Eighth Floor,

15   Hammond, Indiana, commencing at 1:02 p.m., on the 3rd day

16   of July, 2008.

17

18

19

20

21

22

23

24

1   to the position of management analyst.  During the

2   time that I was attending law school, which I

3   attended law school while employed by Morgan, Lewis &

4   Bockius, I was promoted to the position of section

5   administrator for the business and finance practice

6   group, and then most recently in 1994 I was promoted

7   into what was the early beginnings of the position

8   that I have today, and that has developed into the

9   role of assistant counsel to the firm.

10      Q   Okay.  Let me start with the first position,

11   the general administrative position.

12          Could you describe for me the types of

13   things that you did in that job?

14      A   I was involved with various space expansion

15   plans working with architects and contractors as we

16   expanded space within the firm.  I worked with

17   various vendors buying different things for the firm,

18   services, goods that we needed.  I was also involved

19   with supervising the purchasing person at that point.

20      Q   Can you answer the same question then with

21   regard to your position as a management analyst?

22      A   When I was the management analyst, I was

23   asked to begin reviewing various processes that the

24   firm was involved in with the hope that we could make

1    become assistant counsel to the firm, it was actually

2    called assistant to the firm managing partner,

3    because at that point the person who led the firm,

4    the title was firm managing partner.  Today it

5    happens to be firm chair in the reorganization that

6    we undertook some ten years ago probably at this

7    point.  And I began assisting the firm managing

8    partner with a variety of issues affecting the firm,

9    legal type issues, but primarily my responsibilities

10   were in the area of risk management, particularly

11   with regards to new business intake, and I continued

12   my responsibilities working very closely with lateral

13   partners.

14          Over the years as the firm has grown and my

15   experience level has grown, I have undertaken more

16   responsibilities.  I assist with many contractual

17   issues where the firm is contracting to acquire goods

18   or services other than in the area of real estate

19   where our real estate specialists take care of that.

20   And I continue to be involved with risk management,

21   conflicts of interest issues, assisting our partners

22   in resolving those issues, sometimes working directly

23   with clients on those issues, and generally assisting

24   the partnership in the area of professional

1    responsibility and also fiduciary review.

2        Q    Okay.  Are you a U.S. citizen?

3        A    I am.

4        Q    Born here or naturalized?

5        A    Naturalized.

6        Q    When was that?

7        A    July 2000.

8        Q    All right.  Can you tell me when you started

9    to go to law school?

10       A    I started in August of 1989.

11       Q    Okay.  And when did you complete law school?

12       MR. SOLIS:  I'm sorry there, Mr. Feldt.  You cut

13   out.  If you could repeat that question.

14   BY MR. FELDT:

15       Q    When did you complete law school?

16       A    I completed law school December of 1992.

17       Q    Where did you go to law school?

18       A    Temple University School of Law in

19   Philadelphia.

20       Q    And you obtained a Juris Doctorate?

21       A    I did.

22       Q    And can you briefly summarize your college

23   education prior to that time?

24       A    I obtained a bachelor degree from the

1    Q    2, Paragraph 6.

2    A    Yes.

3    Q    Do you see that paragraph?

4    A    I do.

5    Q    Do you see the reference to personnel records

6    and documents that are maintained by Morgan Lewis in

7    the ordinary course of business?

8    A    Yes.

9    Q    What are the documents that you were

10   referring to there?

11   A    I'm referring to the various systems and

12   databases that we have in place that together produce

13   something, for example, like Mr. Lubar's biography.

14   You will see that he is identified with his telephone

15   number, his office location, his education, bar

16   admissions.  All of that information is fed into

17   databases and I relied upon that.  I don't mean

18   personnel records in terms of, for example, a hard

19   copy file that's kept in a file drawer.

20   Q    All right.  Anything else besides the

21   database you described?

22   A    I don't believe so, no.

23   MS. SOLIS:  Besides what she's already testified

24   to, correct?

1          residence?")

2    THE WITNESS:  I believe that there is.

3    MS. SOLIS:  And I'm going to interpose my same

4  objection.

5  BY MR. FELDT:

6    Q    And what is that information?

7    A    That information would be that Mr. Lubar is a

8  partner, noting our London office, London office

9  address, telephone number, contact information, and

10  describing Mr. Lubar's practice as handling inbound

11  work to the United Kingdom.

12    Q    Anything else?

13    A    That he's a registered foreign lawyer.

14    Q    Anything else?

15    A    That he opened our London office in 1981.

16    Q    Anything else?

17    A    No.  That's it.  That all suggests to me that

18  Mr. Lubar is in London.

19    Q    I apologize.  You did cut out a little bit

20  there at the end.

21    MS. SOLIS:  That's okay.  We're having the same

22  issues on this end.

23  BY MR. FELDT:

24    Q    Now I'm going to have you take a look at

1    No. 9, which essentially is the same kind of question

2    as to Ms. Yano.  You can read through to yourself the

3    request and the objections and/or response.

4        A    Okay.

5        Q    So the same question then would be what

6    information on Ms. Yano's bio is relevant to her

7    place of residence or domicile?

8        MS. SOLIS:  Same objection.  You can go ahead and

9    answer that, Clare.

10       A    Very similar to Mr. Lubar's biography.  We

11   note that Ms. Yano's address is in Tokyo.  We give

12   her telephone number, fax number, note that Ms. Yano

13   is a Japanese speaker, that she has practiced in

14   Tokyo for more than 15 years, a description of her

15   representation of Japanese companies, noting that

16   she's a visiting professor at the Tokyo School of

17   Law, and noting that she's admitted to practice, as

18   we already discussed, in New York and California, and

19   that she is registered as a foreign lawyer in Japan.

20   BY MR. FELDT:

21       Q    And all of that information relates to where

22   she works?

23       A    It does.

24       Q    Is there any information on her bio about

1    A    I looked at some of them, but not all of them.

2    Q    Do you recall which ones you looked at?

3    A    I specifically recollect the various --

4    they're almost invoices for bar licensing within

5    various jurisdictions.  Those are under my personal

6    control.

7    Q    Okay.  Any others that you can recall looking

8    at as you prepared your declaration?

9    A    No.

10    Q    After your -- Hang on a second.  I got to get

11    these back in the right order.

12         After your declaration and the attachments

13    to your declaration within Exhibit 3, there is a

14    Page 155 and a Page 156.

15         Would you have looked at those documents in

16    preparing your declaration?

17    A    I did not.

18    Q    And if you could take a look at Exhibit 4.

19    A    Yes.

20    Q    In Paragraph 2, you use the term "who are

21    resident outside of the United States," and I guess I

22    might use slightly different grammar myself.  I'm not

23    suggesting that your grammar is not correct.  What

24    I'm asking, though, is when you say "who are resident

1     works out of the London office?

2         A    That is correct.  It is a term that we use

3     here when we talk about where partners -- anyone is

4     working, I would say they are resident in, Mr. Lubar,

5     the London office.  If someone was speaking about me,

6     they would say I am resident in the Philadelphia

7     office.

8         Q    And when you say "here," you mean within

9     Morgan Lewis?

10        A    Yes, within Morgan Lewis.  That's how we talk

11    about people's office location.

12        Q    Now, you indicate in Paragraph 3 "Mr. Lubar

13    has no immediate plans to leave the United Kingdom

14    and to return to the U.S. to live on a permanent

15    basis."

16             What is that based upon?

17        A    That is based upon interaction with

18    Mr. Lubar, I believe it was via e-mail, asking him

19    about his intent.

20        Q    Okay.  And when was the e-mail?

21        A    Around the end of May or the beginning of

22    June.

23        Q    All right.  Did you initiate the e-mail?

24        MS. SOLIS:  I'm sorry.  You cut out a little bit,

1    Rob.  Can we have that one again?

2    BY MR. FELDT:

3        Q    Did you initiate the e-mail?

4        A    I don't remember.

5        Q    Do you recall if he sent the e-mail in

6    response to a phone call from you?

7        A    I do not remember.

8        Q    Do you recall if he sent the e-mail in

9    response to some form of question from you regardless

10   of whether it took an electronic or a telephone form?

11       A    It would have been definitely in relation to

12   a question.  I do not recollect whether it was via

13   telephone, via e-mail.  I specifically recollect that

14   we were in touch with Mr. Lubar to let him know that

15   I needed to make a declaration similar to before and

16   that we needed to discuss issues that had already

17   been discussed in preparation for an earlier

18   declaration.

19       Q    Okay.

20       A    That's my recollection.

21       Q    And when you say an earlier declaration, you

22   mean in the Swiger case?

23       A    I do.

24       MR. FELDT:  Okay.  I got to ask, Tina, do you

1   have this e-mail?  Are you aware of this e-mail?

2        MS. SOLIS:  Are you making a request for it?

3        MR. FELDT:  I thought we did.

4        MS. SOLIS:  I do not have it, but that does not

5   mean that I cannot ask the client for it.

6        MR. FELDT:  Okay.  Well, maybe you're answering

7   my question.  You didn't see it and determine it to

8   be nonresponsive?

9        MS. SOLIS:  My answer is the same as it was when

10  we spoke the other day.

11       MR. FELDT:  Okay.  Well, I personally think it's

12  responsive to our requests.

13       MS. SOLIS:  I think a lot of that depends who

14  else may be on that e-mail, but --

15       MR. FELDT:  Well, I obviously don't know anything

16  about that.

17  BY MR. FELDT:

18       Q    Ms. D'Agostino, without talking about who

19  else may have received the e-mail, other information

20  that may be in the e-mail other than specifically

21  with regard to the statement that serves as the basis

22  for this sentence in Paragraph 3, "Mr. Lubar has no

23  immediate plans to leave the United Kingdom and to

24  return to the U.S. to live on a permanent basis," do

1    you recall the text that Mr. Lubar used to convey

2    that thought to you that resulted in this sentence in

3    Paragraph 3 of your declaration?

4        A    Not specifically.

5        Q    Did he specifically use the word "permanent"?

6        MS. SOLIS:  Objection.  Asked and answered.

7    BY MR. FELDT:

8        Q    This is more precise, but is the word

9    "permanent" --

10       MS. SOLIS:  She can't recall what he said, but go

11   ahead.

12   BY MR. FELDT:

13       Q    Is the word "permanent" your word or his?

14       A    I don't remember.

15       Q    Okay.  Then I guess I want to ask you the

16   same question about the sentence in Paragraph 4 that

17   deals with "partner resident," and is that the same

18   as you said about Mr. Lubar that it means she works

19   in the Tokyo office?

20       A    It is, that's correct.

21       Q    Then there is a sentence, "Ms. Yano has

22   resided in Japan continuously since 1992."

23           What is that based upon?

24       A    That is based upon telephone communication,

1    e-mail communication between Ms. Yano and I when we

2    were establishing certain facts about Ms. Yano not

3    having had the benefit of earlier preparation as we

4    did with Mr. Lubar and is he ready to make this

5    statement.

6        Q    You mean oral information in discussing it

7    with her specifically?

8        A    Yes.  I specifically recollect leaving voice

9    mail messages, receiving voice mail messages, and I

10   do believe there was an e-mail too.  The time

11   difference between Philadelphia and Tokyo sometimes

12   makes direct person-to-person communication sometimes

13   difficult, so we find ourselves sometimes exchanging

14   voice mails or e-mails, of course.

15       Q    I understand that.  I guess I would have a

16   similar comment about any e-mail, that it's

17   responsive, but let me move on to the voice mail

18   message.

19            Assuming that there was a voice mail

20   message, is that something you retained?

21       A    It is not.

22       Q    In Paragraph 4 there is a sentence "Ms. Yano

23   has no immediate plans to leave Japan and to return

24   to the U.S. to live on a permanent basis."

1              Where does that information come from?

2        A    From either the exchange of voice mails or

3    the exchange of e-mails.  The exact one of those two

4    places I cannot answer at this point.

5        Q    Can you recall ever specifically discussing

6    not via some voice mail recorded or e-mail but

7    actually talking directly on the telephone or in

8    person with Ms. Yano about whether she intends to

9    stay in Japan or leaving Japan or return to the U.S.?

10       A    No, not person to person.

11       Q    And the word "permanent" in that sentence, do

12   you recall if that came from her in the voice mail or

13   e-mail, whatever form the communication took, or is

14   that your word?

15       A    I do not recollect.

16       MR. FELDT:  All right.  I'll pass the witness.

17                      EXAMINATION

18   BY MS. SOLIS:

19       Q    Ms. D'Agostino, I just have a couple

20   follow-up questions.

21            Do you remember when Mr. Feldt was asking

22   you the last time you saw Mr. Lubar person to person?

23   Do you remember that line of questioning?

24       A    Yes.

1          MR. FELDT:  No problem.

2     BY MS. SOLIS:

3          Q    Ms. D'Agostino, do you recall when Mr. Feldt

4     was asking you about your duties and responsibilities

5     as assistant counsel to the firm?

6          A    Yes.

7          Q    Do part of your duties and responsibilities

8     include making disclosures in which you must identify

9     Morgan Lewis partners who are domiciled abroad?

10         A    They do.

11         Q    Can you tell us a little bit about that

12    without giving away any client names or confidences,

13    please?

14         A    I can describe two -- I hope that will be

15    helpful -- very generically without having to

16    disclose client confidences.  On a periodic basis,

17    generally on an annual basis, we need to make

18    disclosure of foreign ownership, influence, and

19    control as a part of which we disclose the names and

20    locations of all of our partners, their citizenships,

21    and the ownership percentage that they have of part

22    of the firm, and the purpose of this is for the

23    United States government to understand what

24    percentage is owned by U.S. citizens and what

1    percentage is owned by people who are not citizens of

2    the United States.  Separately we -- this is a

3    twice-a-year basis -- do a survey of all of our

4    partners to ensure that we are in compliance with the

5    Foreign Agents Registration Act statement, because

6    particular representation actually is not active at

7    the moment.  We're not required to make the filing,

8    but we go ahead and do the twice yearly survey asking

9    partners various questions.  And I specifically

10   recollect when Ms. Yano joined the firm that she

11   declared herself as a U.S. citizen, and we have that

12   information as a part of the survey.

13       Q   And as part of your duties and responsibility

14   as assistant counsel to the firm, does that also

15   include having knowledge of where partners of Morgan

16   Lewis are subject to taxation?

17       A   It does.

18       Q   And what part of your duties and

19   responsibilities does that cover?

20       A   We have an entire department who are

21   responsible for partner taxation issues.  My

22   involvement is because typically the people in that

23   department reach out to me and inquire about the

24   citizenship of partners who have recently been

1    admitted either because they have been promoted or

2    because they have lateraled in.

3        Q    And, finally, I believe you've already

4    testified about this, but prior to preparing your

5    declaration in this action, you spoke with Mr. Lubar

6    to verify the information stated in your declaration?

7        A    We either spoke or exchanged e-mails.   In

8    talking about it, I cannot remember which it was.

9        Q    And same question with respect to Ms. Yano.

10   Prior to preparing your declaration, you verified the

11   information contained therein about Ms. Yano prior to

12   signing -- prior to preparing and signing your

13   declaration, correct?

14       A    Most certainly, yes.

15       Q    And as you sit here today, Ms. D'Agostino, is

16   it your understanding that Mr. Lubar currently

17   resides in the United Kingdom?

18       A    It is.

19       Q    As you sit here today, is it your

20   understanding, Ms. D'Agostino, that Mr. Lubar has no

21   immediate plans whatsoever to leave the United

22   Kingdom and return to the U.S.?

23       A    It is.

24       Q    And as you sit here today, is it your

1    understanding that Ms. Yano resides in Tokyo, Japan?

2        A    It is.

3        Q    And as you sit here today, Ms. D'Agostino, is

4    it your understanding that Ms. Yano has no immediate

5    plans to leave Japan and return to the United States

6    to live?

7        A    It is.

8        MS. SOLIS:    That's all I have.    Thank you very

9    much for your time today, ma'am.

10                        FURTHER EXAMINATION

11    BY MR. FELDT:

12        Q    Ms. D'Agostino, I just have a little bit of

13    follow-up.

14            The last two questions about Mr. Lubar and

15    your statements in the declaration, all of that

16    information is based upon information given to you by

17    Mr. Lubar about where he lives and where he intends

18    to stay?

19        A    It is.

20        Q    And it's not based upon any personal

21    knowledge of your own, correct?

22        MS. SOLIS:    Objection.    Other than her testimony

23    about when she's seen him in London in the office and

24    things of that nature, correct?

```
 1                    FURTHER EXAMINATION
 2    BY MS. SOLIS:
 3        Q    I just have two follow-up questions.
 4             When you spoke with Mr. Lubar about the
 5    information contained in your declaration, did you
 6    expect him to give you truthful and accurate answers?
 7        A    I did.
 8        Q    And when you spoke to Ms. Yano about her
 9    information contained in your declaration, did you
10    expect her to give you truthful and accurate answers?
11        A    I did.
12        Q    Any reason to think that Mr. Lubar was not
13    truthful or accurate with you?
14        A    Not at all.
15        Q    Any reason to think that Ms. Yano was not
16    truthful or accurate with you?
17        A    No, not at all.
18        MS. SOLIS:   Thank you very much.   I'll pass the
19    witness back, if there is anything else.
20        MR. FELDT:   Sure.
21                    FURTHER EXAMINATION
22    BY MR. FELDT:
23        Q    If I asked Mr. Lubar those questions about
24    his intent, would there be a reason for him to be
```

1    more truthful with you than with me?

2       A    I think that's speculation, but I cannot

3    imagine to the contrary.

4       Q    So if I got to ask Mr. Lubar those questions,

5    you would expect him to be truthful with me?

6       A    Of course.

7       Q    And if I asked Ms. Yano those questions, you

8    would expect her to be truthful with me?

9       A    Yes.

10      Q    Do you know any reason why Mr. Lubar wouldn't

11   want to talk to me?

12      MS. SOLIS:  Objection.  I am going to -- You're

13   getting pretty far afield here.  You need to ask,

14   Mr. Feldt, under the Federal Rules of Civil Procedure

15   and the limitations contained therein.  You can make

16   your request and you can make your request from

17   Mr. Lubar and Ms. Yano, but the attorneys will deal

18   with that.

19      MR. FELDT:  Well, I already did.  But let me

20   rephrase the question.

21   BY MR. FELDT:

22      Q    Have you ever talked about -- Have you ever

23   talked with Mr. Lubar about whether or not he would

24   be willing to give a deposition?

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

MORGAN, LEWIS & BOCKIUS LLP, )
)
    Plaintiff, )
)
   v. )   No. 08 CV 2748
)   Judge Pallmeyer
CITY OF EAST CHICAGO, )   Magistrate Judge Schenkier
)
    Defendant. )

**PLAINTIFF'S RESPONSES AND OBJECTIONS TO
DEFENDANT'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS**

   Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff Morgan, Lewis & Bockius LLP ("Plaintiff" or "Morgan Lewis"), hereby serves its Responses and Objections to Defendant the City of East Chicago's ("Defendant" or "East Chicago") First Requests for Production of Documents. Morgan Lewis reserves the right to supplement or amend its Objections and Responses to these Requests for Production in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.

**GENERAL OBJECTIONS**

   Morgan Lewis objects generally to East Chicago's First Requests for Production of Documents to the extent that they call for information protected by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or defense.

   Morgan Lewis also objects generally to East Chicago's First Requests for Production of Documents to the extent they impose burdens, obligations, or requirements in excess of those required or permitted by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of Illinois, or any other applicable rule or order issued by the Court.

more specifically.

## SPECIFIC OBJECTIONS AND/OR RESPONSES
### (in addition to all General Objections)

### REQUESTS FOR DOCUMENTS

**1.    All documents upon which Ms. Clare D'Agostino relied with regard to her Declaration of June 4, 2008.**

**OBJECTIONS AND/OR RESPONSE:** Morgan Lewis responds that Clare D'Agostino ("Ms. D'Agostino") relied on documents maintained by Morgan Lewis in the ordinary course of business, including information from various files and/or databases on residence and the information available on the Morgan Lewis website regarding Charles Lubar ("Mr. Lubar") and Lisa Yano ("Ms. Yano"). This information and documents relevant to the Motion to Remand will be produced.

**2.    All documents utilized as the basis for the representations about Mr. Lubar's citizenship, domicile or partnership in the *Swiger* matter, Civil Action No. 05-CV-5725, United States District Court for the Eastern District of Pennsylvania.**

**OBJECTIONS AND/OR RESPONSE:** Morgan Lewis will produce the first page of Mr. Lubar's 2005 United Kingdom tax return (ML00128); the first page of Mr. Lubar's 2004 United States tax return (ML00129); statements for bar dues paid by Mr. Lubar in 2004 and 2005 to the Maryland Bar; (ML00130-131); statements for bar dues paid by Mr. Lubar in 2004 and 2005 to the District of Columbia Bar (as an inactive member) (ML00132-133); a November 2005 statement from the Law Society regarding Mr. Lubar's registration as a Registered Foreign Lawyer (ML00134); Mr. Lubar's Washington, D.C. driver's license (ML00136); a June 2006 bank statement from Mr. Lubar's bank account with Coutts Bank, Geneva, Switzerland (ML00137); a July 2006 bank statement from Mr. Lubar's bank account with SunTrust Bank, Orlando, Florida,

1175436-2                                    3

which account is located in Washington, D.C. (ML00138-139); a 2004 interest statement from an account with Fleet National Bank, Scranton, Pennsylvania, relating to Mr. Lubar's payment of New York real estate tax (ML00147); a May 2006 statement from Mr. Lubar's Citigroup Global Markets, Inc. brokerage account (ML00140); January 2006 and March 2006 Chase mortgage loan statements for Mr. Lubar's apartment in New York, New York (ML00142-143); a June 2006 Citibank mortgage account statement for Mr. Lubar's apartment in New York, New York (ML00141); a July 2006 statement for payment of property maintenance fees for residential property owned by Mr. Lubar in London, United Kingdom (ML00144); a January 2006 statement for payment of property maintenance fees for Mr. Lubar's apartment in New York, New York (ML00145); a January 2005 statement regarding payment of real estate taxes for Mr. Lubar's apartment in New York, New York (ML00146); a 2004 United States tax return mortgage interest statement for Mr. Lubar's apartment in New York, New York (ML00148). Each of these documents is redacted so as not to reflect any confidential personal information.

   3.    **All documents which refer to Mr. Lubar's citizenship and/or domicile.**

   **OBJECTIONS AND/OR RESPONSE:** Morgan Lewis will produce all of the documents described in response to Request No. 2 (ML00128-48), as well as Mr. Lubar's United Kingdom passport (ML00001-0037); Mr. Lubar's United States passport (ML00038-00067); Mr. Lubar's certificate of naturalization as a British citizen (ML00155); Mr. Lubar's business card (ML00069); Mr. Lubar's letterhead (ML00070); a statement for bar dues paid in 2007 by Mr. Lubar to the Maryland Bar (ML00071); a statement for bar dues paid in 2008 by Mr. Lubar to the District of Columbia Bar (as an inactive member) (ML00075); Mr. Lubar's 2006 application for renewal as a Registered

1175436-2                                    4

Foreign Lawyer (ML00072); a 2008 statement from the Law Society regarding Mr. Lubar's registration as a Registered Foreign Lawyer (ML00073); a June 24, 2008 e-mail from the Solicitors Regulation Authority confirming that Mr. Lubar is a Registered Foreign Lawyer (ML00074); a June 27, 2008 statement from the Solicitors Regulation Authority regarding Mr. Lubar's registration as a Registered Foreign Lawyer (ML00156); the cover sheet of Mr. Lubar's 2006 U.S. tax return (ML00076); the first page of Mr. Lubar's 2006 United States tax return (ML00077); Form 2555 of Mr. Lubar's 2006 United States tax return (ML00078-80); Form 1042-S of Mr. Lubar's 2007 United States tax return (ML00081); the first and second pages of Mr. Lubar's 2007 United Kingdom tax return (ML00082-83); September 2007 and May 2008 account statements from SunTrust Bank, Orlando, Florida which account is located in Washington, D.C. (ML00084-85); a March 2008 account statement for Leumi Bank, Jersey (ML00086); a March 2008 account statement from Citibank, New York, New York (ML00087); a January 2007 account statement from Coutts & Co. Bank, London, United Kingdom (ML00088); a June 2008 statement regarding Mr. Lubar's payment of rent for his apartment in London, United Kingdom (ML00096-97); a January 2008 gas bill for Mr. Lubar's apartment in London, United Kingdom (ML000103); an April 2008 electric bill for Mr. Lubar's apartment in London, United Kingdom (ML00104); a January 2008 tax bill for residential property owned by Mr. Lubar in London, United Kingdom (ML00100); April 2008 and June 2008 statements for Mr. Lubar's payment of property maintenance fees for residential property owned by Mr. Lubar in London, United Kingdom (ML00089, 00092-95); July 2007 and September 2007 statements for Mr. Lubar's payment of property maintenance fees for his apartment in New York, New

York (ML00090-91); April 2008 and May 2008 Citibank mortgage account statements for Mr. Lubar's apartment in New York, New York (ML00098-99); July 2007 and October 2007 gas and electric bills for Mr. Lubar's apartment in New York, New York (ML00101-102). Each of these documents is redacted so as not to reflect any confidential personal information.

4.    **All documents which refer to Ms. Yano's citizenship and/or domicile.**

**OBJECTIONS AND/OR RESPONSE:** Morgan Lewis will produce the first page of Ms. Yano's United States passport (ML00105); Ms. Yano's Japanese driver's license (ML00107); Ms. Yano's Certificate of Alien Registration (ML00106); a statement for bar dues paid in 2008 by Ms. Yano to the California Bar (ML00109); a statement for bar dues paid in 2006 by Ms. Yano to the New York Bar (ML00111); a 2007 statement acknowledging Ms. Yano's change of attorney registration information for the New York Bar (ML00112); a 2008 statement from the New York State Unified Court System regarding Ms. Yano's registration as a member of the New York Bar (ML00110); Ms. Yano's Notice for Registration as Foreign Lawyer in Japan (ML00113-115); the Governmental Gazette providing notice of Ms. Yano's registration as a Foreign Lawyer; (ML00116); Ms. Yano's business card (ML00108); the first page of Ms. Yano's 2006 United States tax return (ML00117); an April 2008 bank account statement from Citibank (ML00118); a May 2008 consolidated bank and brokerage account statement from Citibank (ML00119); a May 2008 brokerage account statement from Fidelity Investments (ML00120); a May 2008 Citibank mortgage loan statement for residential property owned by Ms. Yano in Kanagawa-Ken, Japan (ML00121-123); a 2008 property registration statement for residential property owned by Ms. Yano in Kanagawa-Ken,

1175436-2                                    6

Japan (ML00125-127); a 2008 tax bill for Ms. Yano's condominium in Tokyo, Japan (ML00124). Each of these documents is redacted so as not to reflect any confidential personal information.

**5.     Any document related to or showing that any individual classified as or considered to be a partner with Morgan Lewis is a citizen or domiciliary of the State of Indiana, and for each such individual, provide all partnership documents.**

**OBJECTIONS AND/OR RESPONSE**: Morgan Lewis responds by stating that there are no responsive documents to this request in Morgan Lewis' possession, custody, or control.

**6.     All partnership agreements which form the basis for Plaintiff's claims that Mr. Lubar and Ms. Yano are partners of Morgan Lewis.**

**OBJECTIONS AND/OR RESPONSE**: Morgan Lewis objects to this request on the grounds that it is beyond the discovery authorized by the Court on issues related to the Motion to Remand. It is not reasonably calculated to lead to the discovery of admissible evidence. Morgan Lewis further responds by stating that information confirming Mr. Lubar and Ms. Yano's status as Morgan Lewis partners is publicly available on Morgan Lewis' website, on the Martindale-Hubbell Law Directory, and from various other similar sources. Morgan Lewis further responds by producing the letterhead of Mr. Lubar (ML00070) and the business card of Ms. Yano (ML00108), which acknowledge the status of each as "Partner."

**7.     All documents which reflect an ownership or occupancy interest in real property held by Mr. Lubar and Ms. Yano, respectively, between January 1, 2002 and the present date.**

**OBJECTIONS AND/OR RESPONSE**: Morgan Lewis will produce the following documents regarding Mr. Lubar: January 2006 and March 2006 Chase

1175436-2                                        7