### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MORGAN, LEWIS & BOCKIUS LLP,     )
                                       )
                Plaintiff,      )
                                       )
        v.                 )      No. 08 CV 2748
                                       )      Judge Pallmeyer
CITY OF EAST CHICAGO,           )      Magistrate Judge Schenkier
                                       )
            Defendant.     )

### MOTION FOR LEAVE TO FILE SUPPLEMENTAL
### EXHIBITS IN FURTHER SUPPORT OF MOTION TO REMAND

Plaintiff Morgan, Lewis & Bockius LLP ("Morgan Lewis"), by its undersigned attorneys, moves the Court for entry of an order granting Morgan Lewis leave to file supplemental exhibits in further support of its Motion to Remand the above-captioned action to the Circuit Court of Cook County, Illinois. In support of this motion, Morgan Lewis states:

1.      On June 5, 2008, Morgan Lewis filed a Motion to Remand this action to Circuit Court of Cook County. (Docket #14.) Morgan Lewis relied, in part, on the United States District Court for the Eastern District of Pennsylvania's decision in *Swiger v. Allegheny Energy, Inc.*, 2007 WL 442383 (E.D. Pa. Feb. 7, 2007), where the court granted Morgan Lewis's motion to dismiss for lack of subject matter jurisdiction on the basis that Charles Lubar ("Mr. Lubar"), a Morgan Lewis partner domiciled abroad, is "stateless" for purposes of diversity jurisdiction.

2.      On August 25, 2008, the United States Court of Appeals for the Third Circuit issued its published opinion in the *Swiger* case, affirming the judgment of the district court. (*See Swiger v. Allegheny Energy, Inc.*, No. 07-1707 (3d Cir. Aug. 25,

2008), attached hereto as **Ex. A**.)  The Third Circuit held, "[Mr.] Lubar, a Morgan Lewis partner and American citizen domiciled abroad, is 'stateless' for purposes of diversity jurisdiction.  Because [Mr.] Lubar, as a stateless person, cannot sue or be sued in federal court based upon diversity jurisdiction, neither can Morgan Lewis." (*Id.* at 21.)

3.      Because Morgan Lewis has, from the outset of the proceedings on the Motion to Remand, consistently maintained that the district court in *Swiger* correctly concluded that Mr. Lubar's "stateless" status destroys diversity jurisdiction over Morgan Lewis, Morgan Lewis seeks leave to file the Third Circuit's opinion in *Swiger* as a supplemental exhibit in further support of its Motion to Remand.

4.      Morgan Lewis additionally seeks leave to file excerpts from the transcript of Mr. Lubar's August 19, 2008 deposition as a supplemental exhibit in further support of its Motion to Remand.  Mr. Lubar was deposed pursuant to the Court's order of August 14, 2008.  (Docket #47.)  In his deposition, he testified repeatedly to his residency in the United Kingdom and to his intent to remain there (Lubar Dep. at 1-2, 14, 17-18, 20, 37-40, 51, attached hereto as **Ex. B**), as well as to the fact that his apartment in New York currently is occupied by his son (*id.* at 28-29).  In addition, Mr. Lubar testified to his status as a Morgan Lewis partner (*id.* at 20-22) and stated that he has no intention to retire from his employment with Morgan Lewis (*id.* at 25-27, 51.)  Mr. Lubar's testimony unequivocally confirms that he is a Morgan Lewis partner domiciled in the United Kingdom.

5.      In light of the Third Circuit's decision in *Swiger* and Mr. Lubar's deposition testimony, Morgan Lewis is withdrawing its reliance on the status of Lisa Yano ("Ms. Yano") as a Morgan Lewis partner domiciled abroad for purposes of its

Motion to Remand.  While Morgan Lewis maintains that Ms. Yano is "stateless" for purposes of diversity jurisdiction, Morgan Lewis also maintains, as it has from the outset of the proceedings on the Motion to Remand, that only one Morgan Lewis partner must be "stateless" to destroy diversity jurisdiction.  Because the Third Circuit's opinion in *Swiger* and the deposition testimony of Mr. Lubar overwhelmingly demonstrate that Mr. Lubar is "stateless," Morgan Lewis now relies solely on Mr. Lubar's "stateless" status for purposes of its Motion to Remand.

## CONCLUSION

**WHEREFORE**, Morgan Lewis respectfully requests that the Court enter an order granting it leave to file supplemental exhibits in further support of its Motion to Remand, and granting any further relief the Court deems just.

Dated:   August 26, 2008                                    Respectfully submitted,


                                                            /s/ Tina B. Solis
                                                            One of the Attorneys for
                                                            MORGAN, LEWIS & BOCKIUS
                                                            LLP

                                                            F. Thomas Hecht (ARDC #1168606)
                                                            Tina B. Solis (ARDC #6242461)
                                                            Seth A. Horvath (ARDC #6283110)
                                                            Ungaretti & Harris LLP
                                                            3500 Three First National Plaza
                                                            Chicago, Illinois 60602
                                                            Telephone (312) 977-4400
                                                            Facsimile (312) 977-4405

## SERVICE OF DOCUMENTS BY ELECTRONIC MEANS

I, Tina B. Solis, an attorney, certify that service of this document was accomplished pursuant to ECF on all Electronic Filing Users of record this 26th day of August 2008.

/s/ Tina B. Solis

# EXHIBIT A

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 07-1706

_____

CLIFTON G. SWIGER

Appellants

v.

ALLEGHENY ENERGY, INC.,
ALLEGHENY ENERGY SUPPLY CO., LLC,
ALLEGHENY ENERGY SERVICES CORP., and
MORGAN, LEWIS & BOCKIUS, LLP

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 05-CV-5725)
District Judge: The Honorable J. Curtis Joyner

_____

Argued March 25, 2008

BEFORE:  MCKEE, RENDELL and TASHIMA[*],
Circuit Judges,

(Filed: August 25, 2008)

Gregory A. Beck (Argued)
Paul Alan Levy
Public Citizen Litigation Group
1600 20th Street, NW
Washington, DC 20009
*Counsel for Appellants*

Theresa J. Chung (Argued)
Michael J. Ossip, Esq.
Michael A. Bloom, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103

Sara A. Begley, Esq.
Robert A. Nicholas, Esq.
Tracey G. Weiss, Esq.
Reed Smith 1650 Market Street
2500 One Liberty Place
Philadelphia, PA 19103-7301
*Counsel for Appellees*

---

[*]　The Honorable A. Wallace Tashima, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

---

OPINION

---

TASHIMA, <u>Circuit Judge</u>:

We must decide whether a federal district court has diversity jurisdiction over a lawsuit involving a partnership where one of its partners is a dual American-British citizen domiciled in a foreign state. The district court held that it lacked diversity jurisdiction over such an entity, and we affirm.

## I. APPELLATE JURISDICTION & STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291 over a dismissal for lack of subject matter jurisdiction, and our review for lack of subject matter jurisdiction is plenary. *See Frett-Smith v. Vanterpool*, 511 F.3d 396, 399 (3d Cir. 2008).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Clifton G. Swiger sued Allegheny Energy, Inc.,

3

Allegheny Energy Supply Co., LLC, Allegheny Energy Services Corp., and Morgan, Lewis & Bockius LLP ("Morgan Lewis"), (collectively "Defendants"), on several state law claims, including abuse of process, wrongful use of civil proceedings, invasion of privacy, and wrongful discharge, in the Eastern District of Pennsylvania based upon diversity jurisdiction.

Morgan Lewis, joined by the other Defendants, moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), on the ground that complete diversity between the parties was lacking. Morgan Lewis is a partnership that, at the time of the filing of the lawsuit, had among its partners, Charles Lubar, a dual United States and United Kingdom citizen domiciled in the United Kingdom. The district court dismissed the case for lack of jurisdiction, concluding that "[g]iven that for diversity purposes, the court must consult the citizenship of *all* of the members of an artificial entity such as

4

a general or limited partnership and because a United States citizen who is not domiciled in one of the United States cannot invoke diversity jurisdiction in one particular state, we must conclude that we are without jurisdiction to act in this matter." *Swiger v. Allegheny Energy, Inc.*, No. 05-CV-5725, 2007 WL 442383, at *5 (E.D. Pa. Feb. 7, 2007) (emphasis in the original) (citations omitted). Swiger timely appealed.

### III. ANALYSIS

Swiger argues that the district court erred in holding that it lacked diversity jurisdiction because, according to Swiger, a single partner who is not a citizen of a state does not render the entire partnership stateless for diversity purposes.[1] Whether a federal district court has diversity jurisdiction over a lawsuit

---

[1]    Swiger "assumes" that Lubar is in fact stateless, thus accepting the factual basis of the district court's ruling, that Lubar is an American-British dual citizen domiciled in the United Kingdom.

5

involving a partnership that has among its partners an American citizen domiciled in a foreign state is an issue of first impression in this Circuit. To our knowledge, however, all courts that have addressed this issue have held that such an entity does not qualify for diversity jurisdiction. For the reasons set forth below, we agree with those other courts and hold that if a partner of a partnership is a United States citizen permanently living abroad, there can be no diversity of jurisdiction over the partnership because the partner is neither a citizen of a state nor a citizen of a foreign country.

Swiger also argues that even if the stateless partner destroys diversity, the district court nevertheless had alienage jurisdiction because Lubar, as a dual citizen of the United States and the United Kingdom, is a citizen or subject of a foreign state. This argument, however, is foreclosed by our recent decision in *Frett-Smith*, 511 F.3d at 400, in which we held that,

6

for purposes of diversity jurisdiction, we consider only the American citizenship of a dual American-foreign national. We consider each of Swiger's arguments in turn.

A.    *Diversity Jurisdiction and the "Stateless" Partner*

Under 28 U.S.C. § 1332(a):

> district courts . . . have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—(1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state; (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

A natural person is deemed to be a citizen of the state where she is domiciled. *See Gilbert v. David*, 235 U.S. 561, 569 (1915). A corporation is a citizen both of the state where it is incorporated and of the state where it has its principal place of business. 28 U.S.C. § 1332(c).

7

Partnerships and other unincorporated associations, however, unlike corporations, are not considered "citizens" as that term is used in the diversity statute. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 187–92 (1990) (holding that a limited partnership is not a citizen under the jurisdictional statute); *see also Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 84 n.1 (2006) ("[F]or diversity purposes, a partnership entity, unlike a corporation, does not rank as a citizen[.]"); *United Steelworkers of Am. v. Bouligny*, 382 U.S. 145, 149–50 (1965) (holding that a labor union is not a citizen for purposes of the jurisdictional statute); *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 454–55 (1900) (holding that a limited partnership association, even though it was called a quasi-corporation and declared to be a citizen of the state under the applicable state law, is not a citizen of that state within the meaning of the jurisdictional statute); *Chapman v. Barney*, 129 U.S. 677, 682 (1889) (holding

8

that although the plaintiff-stock company was endowed by New York law with the capacity to sue, it could not be considered a "citizen" for diversity purposes); 15 James Wm. Moore, *Moore's Federal Practice* § 102.57[1] (3d ed. 2006) [hereinafter *Moore's Federal Practice*] ("[A] partnership is not a 'citizen' of any state within the meaning of the statutes regulating jurisdiction[.]").

Given that partnerships are not citizens for diversity purposes, the Supreme Court has long applied the rule of *Chapman v. Barney*: that courts are to look to the citizenship of all the partners (or members of other unincorporated associations) to determine whether the federal district court has diversity jurisdiction. *See Lincoln Prop. Co.*, 546 U.S. at 84 n.1; *Carden*, 494 U.S. at 196–97; *Bouligny*, 382 U.S. at 151; *Great S. Fire Proof Hotel*, 177 U.S. at 456; *Chapman*, 129 U.S. at 682; *see also* 13B Charles Alan Wright et al., *Federal Practice &*

9

*Procedure* § 3630 (2d ed. 1984) ("[W]henever a partnership, a

limited partnership . . . , a joint venture, a joint stock company,

a labor union, a religious or charitable organization, a governing

board of an unincorporated institution, or a similar association

brings suit or is sued in a federal court, the actual citizenship of

each of its members must be considered in determining whether

diversity jurisdiction exists."). In *Chapman*, the Supreme Court,

on its own motion, reversed a judgment on the grounds that the

federal court did not have jurisdiction over a stock company

because the record did not demonstrate that all the partners of

the stock company were citizens of a state different than that of

the defendant:

> On looking into the record, we find no
> satisfactory showing as to the citizenship of the
> plaintiff. The allegation of the amended petition
> is that the United States Express Company is a
> joint-stock company organized under a law of the
> state of New York, and is a citizen of that state.
> *But the express company cannot be a citizen of*
> *New York, within the meaning of the statutes*

10

*regulating jurisdiction, unless it be a corporation.*
[T]he company . . . is, a mere partnership. . . .

. . . . The company may been organized
under the laws of the State of New York, and may
be doing business in that State, and yet all the
members of it may not be citizens of that State.
The record does not show the citizenship of
Barney, or of any of the members of the company.

129 U.S. at 682 (emphasis added).  In a nearly unbroken chain,[2]

---

[2]    As the Supreme Court put it in *Carden*:
The one exception to the admirable consistency
of our jurisprudence [regarding the *Chapman*
rule] is *Puerto Rico v. Russell & Co.*, 288 U.S.
476 (1933), which held that the entity known as
a soceidad en comandita, created under the civil
law of Puerto Rico, could be treated as a citizen
of Puerto Rico for purposes of determining
federal-court jurisdiction. . . . [However,]
[t]here could be no doubt, after *Bouligny*, that at
least common-law entities (and likely all entities
beyond the Puerto Rican sociedad en
comandita) would be treated for purposes of the
diversity statute pursuant to what *Russell* called
"[t]he tradition of the common law," which is
"to treat as legal persons only incorporated
groups and to assimilate all others to

(continued...)

11

the Supreme Court has consistently applied the *Chapman* rule,
holding that a partnership is not a citizen, but that the court
"must look in the case of a suit by or against a partnership
association to the citizenship of the several persons composing
such association." *Great S. Fire Proof Hotel*, 177 U.S. at 456;
*see also Carden*, 493 U.S. at 189; *Bouligny*, 382 U.S. at 151.

Further, in the context of partnerships, the complete
diversity requirement demands that all partners be diverse from
all parties on the opposing side. *See Lincoln Prop. Co.*, 546
U.S. at 84 n.1; *accord Carden*, 494 U.S. at 195 (accepting the
"rule that the Court will . . . count every member of an
unincorporated association for purposes of diversity
jurisdiction" and "reject[ing] the contention that to determine,
for diversity purposes, the citizenship of an artificial entity, the

---

[2](...continued)
        partnerships."
494 U.S. at 189–90.

12

court may consult the citizenship of less than all of the entity's members"); *Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1259 (3d Cir. 1977) ("When the rule of complete diversity is read in conjunction with the principle that the citizenship of a partnership depends upon that of its members, it becomes clear that diversity jurisdiction may not obtain here, unless all of the members of the plaintiff partnership are of distinct citizenship from all of the defendants."); *Underwood v. Maloney*, 256 F.2d 334, 338 (3d Cir. 1958) ("[W]here jurisdiction is sought to be founded on diversity of citizenship, the action being by or against an unincorporated association . . . the citizenship of the individual members must be shown to be wholly diverse from that of the opposing party or those of the opposing parties."); *cf. Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806) ("[W]here the interest is joint, each of the persons concerned in that interest

13

must be competent to sue, or liable to be sued in [the federal] courts.").

Partnerships which have American partners living abroad pose a special problem. "In order to be a citizen of a State within the meaning of the diversity statute, a natural  person must be both a citizen of the United States and be domiciled within the State." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1988). An American citizen domiciled abroad, while being a citizen of the United States is, of course, not domiciled in a particular state, and therefore such a person is "stateless" for purposes of diversity jurisdiction. *See id*. Thus, American citizens living abroad cannot be sued (or sue) in federal court based on diversity jurisdiction as they are neither "citizens of a State," *see* 28 U.S.C. § 1332(a)(1), nor "citizens or subjects of a foreign state," *see id.* § 1332(a)(2). *See Newman-Green*, 490 U.S. at 826.

14

Putting these principles together, that is, that the citizenship of the individual partners must be shown to be wholly diverse from that of the opposing party (or those of the opposing parties) and that American citizens living abroad cannot sue (or be sued) in federal court based on diversity jurisdiction, our sister circuits and other federal courts have concluded that if a partnership has among its partners any American citizen who is domiciled abroad, the partnership cannot sue (or be sued) in federal court based upon diversity jurisdiction. *See Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001); *accord ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003) ("One of [the partnership's] partners is a U.S. citizen domiciled in Canada; she has no state citizenship, so the diversity jurisdiction is unavailable."); *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 69 (2d Cir. 1990) ("If in fact any of S & C's foreign-residing

15

United States citizen partners are domiciled abroad, a diversity
suit could not be brought against them individually; in that
circumstance, since for diversity purposes a partnership is
deemed to take on the citizenship of each of its partners, a suit
against S & C could not be premised on diversity." (internal
citations omitted)); *see also* 15 *Moore's Federal Practice* §
102.37[16] ("If a member of a partnership is a United States
citizen permanently living abroad, there can be no diversity of
jurisdiction because the member is neither a citizen of a state nor
a citizen of a foreign country.").

Swiger, however, asks us to disregard these cases and
create an exception to the *Chapman* tradition. He argues that we
should ignore Lubar's lack of state citizenship and focus only on
the partners who are citizens of a state. Morgan Lewis has
American partners domiciled in, among other states,
Pennsylvania, New York, and California; therefore, Morgan

16

Lewis, according to Swiger, is a citizen of Pennsylvania, New York, California, and so on. Although Morgan Lewis has a stateless partner, Swiger contends that the partnership can hardly be characterized as "stateless"; indeed, under this view, Morgan Lewis is quite "stateful." That is, according to Swiger, one party, Morgan Lewis, is a citizen of Pennsylvania, New York, and California, and so on, and the other party, Swiger, is a citizen of West Virginia, ipso facto, the parties are "citizens of different States."

We cannot agree. First, the Supreme Court has explicitly held, and consistently stated, as we have already noted, that a partnership is not a "citizen" for purpose of diversity jurisdiction. Instead, for purposes of diversity jurisdiction, a partnership's citizenship as a party is determined by reference to *all* partners, and *all* partners must be diverse from *all* parties on

17

the opposing side.[3] *Lincoln Prop. Co.*, 546 U.S. at 84 n.1; *see also Carden*, 494 U.S. at 195 ("[W]e reject the contention that to determine, for diversity purposes, the citizenship of an artificial entity, the court may consult the citizenship of less than all of the entity's members."). Second, Morgan Lewis, as an entity, is just as "stateless" as it is "stateful": Morgan Lewis is not an American citizen, and it "has no domicile in any state."

---

[3]    Despite this, Swiger contends that the Supreme Court's recent decision in *Grupo Dataflux v. Atlas Global Group, L.P.*, supports his view that the partnership takes on the state citizenship of its partners. *See* 541 U.S. 567, 569 (2004) ("[A]s a partnership, [it] is a citizen of each State or foreign country of which any of its partners is a citizen."). *Grupo Dataflux*, however, does not change the basic principles as to how an unincorporated association's citizenship is determined for purposes of diversity jurisdiction. Indeed, in a post-*Grupo Dataflux* opinion, the Supreme Court again reiterated that "for diversity purposes, a partnership entity, unlike a corporation, does not rank as a citizen; to meet the complete diversity requirement, all partners, limited as well as general, must be diverse from all parties on the opposing side." *Lincoln Prop. Co.*, 546 U.S. at 84 n.1 (citing *Carden*, 494 U.S. at 189, 192–97).

18

But rather than treating partnerships as stateless, the *Chapman*
rule determines the partnership's citizenship for purposes of
diversity by referring to the citizenship of each partner. The rule
of *Chapman* is a legal construct that allows a real legal entity,
though a non-citizen, to sue and be sued in federal court based
upon diversity by looking through the partnership to the
citizenship of each partner.

Because Morgan Lewis has a stateless partner, and thus,
all partners of Morgan Lewis are not diverse from all parties on
the opposing side, the district court correctly held that it lacked
diversity jurisdiction over this action.

B.    *Alienage Jurisdiction*

Swiger argues that even if jurisdiction based on diversity
of state citizenship is lacking, the district court nevertheless had
diversity jurisdiction under 28 U.S.C. § 1332(a)(2), because
Lubar, as a dual citizen of the United States and the United

19

Kingdom would still be a "citizen[] or subject[] of a foreign state," and as such, Lubar would be diverse from Swiger within the meaning of § 1332(a)(2). That is, complete diversity would exist because Swiger is a citizen of West Virginia and Lubar is a citizen of the United Kingdom. After this appeal was briefed, but before oral argument, we decided this question in *Frett-Smith*, in which we held "that for purposes of diversity jurisdiction, only the American nationality of a dual national is recognized." *See Frett-Smith*, 511 F.3d at 400. Because Lubar is a United States citizen, any reliance on § 1332(a)(2)'s alienage jurisdiction would be in error. *Id.* at 400. Thus, "[o]nly if [Lubar] was domiciled in a particular state of the United States at the time the suit was filed, and that state was diverse from that of [Swiger], would subject matter jurisdiction be present" as against Morgan Lewis. *Id.*

IV. CONCLUSION

20

Whenever a partnership (or other unincorporated association) brings suit or is sued in a federal court, the citizenship of each of its partners (or members) must be considered in determining whether diversity jurisdiction exists, and all partners (or members) must be diverse from all parties on the opposing side. Lubar, a Morgan Lewis partner and American citizen domiciled abroad, is "stateless" for purposes of diversity jurisdiction. Because Lubar, as a stateless person, cannot sue or be sued in federal court based upon diversity jurisdiction, neither can Morgan Lewis. The judgment of the district court is **AFFIRMED.**

McKee, *Circuit Judge*, concurring in the judgment.

I agree that the authority relied upon by my colleagues strongly suggests the analysis the lead opinion has adopted and the result my colleagues have reached. I am therefore reluctant

21

to disagree with that conclusion even though I do not think that the result we reach today is necessarily compelled by precedent of this court or the Supreme Court. I am, in fact, concerned that our decision today unnecessarily extends two conventions of diversity jurisprudence and thereby inappropriately circumscribes that jurisdiction. I think my colleagues would agree that it would be more logical to treat "stateless" partners in situations like this as "jurisdictional zeroes," rather than as citizens of the plaintiff's state; but we are not writing on a blank slate.

I realize, of course, that it is not the province of this or any other lower court to undermine the *Carden* rule or the "stateless person" doctrine discussed in the lead opinion. Nevertheless, applying the *Carden* rule and "stateless person" doctrine here results in a ruling that is inconsistent with both reality and common sense. Accordingly, although I concur in

22

the result, I hope that Congress will one day see fit to clarify that our diversity jurisdiction does extend to this situation.

## I.

Article III of the Constitution provides, in pertinent part, that "[t]he judicial Power shall extend to . . . Controversies . . . between Citizens of different States." In its current form, the diversity statute provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds . . . $75,000 . . . and is between . . . citizens of different States . . . ." 28 U.S.C. § 1332(a). In *Chapman v. Barney*, 129 U.S. 677 (1889), the Supreme Court established that the "citizenship" of an unincorporated association (such as a partnership) is defined by the citizenship of its individual members. Unincorporated associations are thus treated differently than corporations which, under a 1958 amendment to the diversity statute, are considered to be citizens of their state

23

of incorporation and of their primary places of business.[1] *See* 28
U.S.C. 1332(c)(1).

The Supreme Court has recognized that the disparate
treatment of partnerships and corporations may not conform
with modern business realities, but the Court has rejected
invitations to reinterpret the rule. *See Carden v. Arkoma
Assocs.*, 494 U.S. 185, 196-97 (1990), *reaffirmed in Grupo
Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 578 n.6
(2004) ("Whether the Constitution requires it or not, *Carden* is

---

[1] Even before the diversity statute was amended, the
Supreme Court had judicially devised the  rule that a
corporation would be treated as a citizen of its state of
incorporation. *See Louisville, C. & C.R. Co. v. Letson*, 43
U.S. (2 How.) 497 (1844). The 1958 amendment, adding the
principal place of business to the corporation's citizenship,
was designed to prevent misuse of the diversity jurisdiction by
corporations. *See* 15 Moore's Federal Practice § 102.50 (3d
ed. 2008). A corporation, treated as out-of-state because
incorporated elsewhere, was unlikely to suffer local prejudice
in the courts of the state where the corporation had its
principal place of business. *Id.*

the subconstitutional rule by which we determine the citizenship

of a partnership - and in this case it leads to the conclusion that

there were *no* opposing parties who were not co-citizens.")

(emphasis in original).  Indeed, in *Carden*, the Court stated that

this rule "can validly be characterized as technical, precedent-

bound, and unresponsive to policy considerations raised by the

changing realities of business organization."  494 U.S. at 196.

Yet, the Court viewed the 1958 amendment to 28 U.S.C. §

1332(c) as evidence of Congress' tacit approval of the rule

regarding citizenship of associations, as "[n]o provision was

made for the treatment of artificial entities other than

corporations." *Id*. at 196-97.  The Court concluded that the

limited scope of the amendment meant that Congress was

content with the existing method of determining the citizenship

of unincorporated associations such as partnerships.

Accordingly, the Court declared that any change to the *Carden*

25

rule must come from Congress, as "[s]uch accommodation is not only performed more legitimately by Congress than by courts, but it is performed more intelligently by legislation than by interpretation of the statutory word 'citizen.'" *Id.*[2]

Nevertheless, despite its apparent relevance to this jurisdictional dispute, *Carden* does not definitively answer the specific question here.   In *Carden*, an Arizona limited partnership brought a diversity action against two Louisiana citizens. *Id.* at 186.  The partnership asserted that complete diversity was satisfied because none of its *general* partners shared the same citizenship as any adverse party.   The citizenship of its *limited* partners, it argued, was irrelevant to the

---

[2] The Court further explained that this course "does not so much disregard the policy of accommodating our diversity jurisdiction to the changing realities of commercial organization, as it honors the more important policy of leaving that to the people's elected representatives." *Carden*, 494 U.S. at 197.

presence of diversity jurisdiction. *Id.* at 192. The Court rejected

that position and held that complete diversity was lacking

because one of the limited partners was, like the defendants, a

citizen of Louisiana, thus precluding complete diversity. The

Court held that the citizenship of partnerships is determined by

the citizenship of *all* of its partners, not just the general partners.

*Id.* at 195-96.

The Court addressed the application of diversity

jurisdiction to partnerships again in *Grupo Dataflux v. Atlas

Global Group, L.P.*, 541 U.S. 567 (2004). There, a Texas-based

limited partnership brought a breach of contract action against

a Mexican corporation based on the alienage clause of the

diversity statute. As explained by the Supreme Court:

> Because [the partnership] had two partners who
> were Mexican citizens at the time of filing, the
> partnership was a Mexican citizen. (It was also a
> citizen of Delaware and Texas based on the
> citizenship of its other partners.) And because the

27

> Defendant . . . was a Mexican corporation, aliens
> were on both sides of the case, and the requisite
> diversity was therefore absent.

*Id.* at 569. Therefore *Grupo Dataflux*, does not advance our

inquiry much more than *Carden*. Neither case directly addresses

the specific jurisdictional question before us. Rather, *Grupo*

*Dataflux*, merely restates the principle that diversity jurisdiction

(or alienage jurisdiction) does not obtain where a plaintiff and

defendant share a common citizenship.

In contrast to *Carden* and *Grupo Dataflux*, no member of

Morgan Lewis (nor any of the other defendants[3]) shares the

citizenship of the plaintiff in this case. Swiger is a citizen of

West Virginia. Morgan Lewis is a limited liability partnership

---

[3] Defendants Allegheny Energy, Inc. and Allegheny
Energy Service Corp. are Maryland corporations with their
principal places of business in Greensburg, Pennsylvania.
Defendant Allegheny Energy Supply Co. is a Delaware
limited liability corporation with its principal place of
business in Monroeville, Pennsylvania.

registered in Pennsylvania with its principal place of business in Philadelphia, Pennsylvania. In addition to its stateless partner, Lubar, Morgan Lewis has partners who are citizens of Pennsylvania, New York and California. It is undisputed that no Morgan Lewis partner is a citizen of West Virginia. Ideally, that should be the beginning and end of our jurisdictional inquiry.

## II.

The rule that a United States citizen permanently domiciled abroad may not sue or be sued on the basis of diversity of citizenship (sometimes called the "stateless person" doctrine) is a doctrine likely born of chance rather than design. It was recognized (without any particular discussion) by the Supreme Court in *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989). The rule has evolved from judicial interpretation of the words of the diversity statute. Section 1332 applies only to suits between "citizens of different States" and

29

"citizens of a State and citizens of a foreign state." 28 U.S.C. 1332(a)(1)-(2). The capitalized "State" refers to U.S. states. Hence, a U.S. citizen with no "State" citizenship falls outside the literal terms of the statute. This was likely not an intentional omission from diversity jurisdiction, but rather flowed from the (now incorrect) assumption that all U.S. citizens would also be domiciled in a U.S. state. *See* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 3621 (2008). *See also Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 415-16 (3d Cir. 1999) (noting likelihood that problem of "stateless" person - in the international sense - was unanticipated by the Framers).

At this point, neither the rule nor the cases that have applied it are open to judicial revision unless the Supreme Court

revisits the issue.[4]   However, the presence of a "stateless"

partner in a partnership whose partners' citizenship is otherwise

completely diverse from all plaintiffs should not summarily

defeat the exercise of our jurisdiction.    After all, it is the

partnership, not the individual partners, who are party to the

action.

### III.

It is certainly not our job to create law. We are, however,

charged with filling gaps in statutes when unforeseen

circumstances create ambiguities. For example, Congress has

declared that a corporation is "deemed to be a citizen of any

State by which it has been incorporated and of the State where

it has its principal place of business." 28 U.S.C. § 1332(c)(1).

However, that statute does not determine if a court has

---

[4] Given its statements in *Carden*, it is not likely to do so
unless Congress once again amends § 1332.

31

jurisdiction when a U.S. corporation has its principal place of business outside of the United States, or has no principal place of business at all. When presented with this situation, courts have not concluded that such a corporation is "stateless" and thereby beyond the reach of diversity jurisdiction. Rather, courts have held that the citizenship of the corporation defaults to the only state citizenship that can be determined - that of the state of incorporation. *See, e.g., Torres v. Southern Peru Copper Corp.,* 113 F.3d 540, 543-44 (5th Cir. 1997); *Cabalcetta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989).

Likewise, if partners in a partnership are citizens of several states, but one (or more) partner is not a citizen of any state, there is no reason to necessarily conclude that subject matter jurisdiction is defeated. Thus, were we free to address the issue of Lubar's citizenship on a clean slate, I hope that we would readily concede that it adds nothing to the diversity

32

equation and that there is no reason to allow it to defeat diversity jurisdiction.    Lubar's residence in England makes him a jurisdictional nullity, and his citizenship should be treated that way for purposes of determining subject matter jurisdiction. *Carden* and *Grupo Datflux* are not necessarily to the contrary. They merely hold that it is the *citizenship* of all the members of a partnership that must be examined, they say nothing about the *lack* of a partner's citizenship.

## IV.

The traditional explanation of the purpose of diversity jurisdiction is "the fear that state courts would be prejudiced against out-of-state litigants." *See* 13B Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 3601 (2008). Morgan Lewis is a nationally prominent law firm whose main office is in Philadelphia, Pennsylvania. It is certainly not unreasonable to believe that local bias might operate in state

33

court in favor of a litigant that is as prominent and influential in the local community as Morgan Lewis.[5] That is the rationale for allowing Swiger to sue in federal court - assuming complete diversity. The rationale is not undermined one iota merely because one of Morgan Lewis' many hundreds of partners has been residing in England and will apparently continue to reside there indefinitely. So long as none of Morgan Lewis' partners is a citizen of Swiger's home state of West Virginia, the purpose of diversity jurisdiction is fully served, and Swiger should be permitted to test the merits of his claim in a federal forum. Lubar's lack of citizenship in any state should not be the jurisdictional equivalent of citizenship in the same state as Swiger. Accordingly, we should be able to conclude that this

---

[5] I do not, of course, suggest the accuracy or wisdom of perpetuating that long-standing assumption, but its historical role in the evolution of our subject matter jurisdiction can not be ignored.

34

suit presents "two adverse parties [who] are not co-citizens."

*Grupo Dataflux*, 541 U.S. at 579 (internal quotation omitted).

## V.

According to one 2004 survey, roughly 10,000 of the 110,000 lawyers at the top 250 U.S. firms work overseas. Michael D. Goldhaber & Carlyn Kolker, *Supersonic Lawyers,* American Lawyer (May 2004).  As business ventures and legal relationships become more global in depth and breadth, the situation we face today will become increasingly common. When the expanding business universe and shrinking globe are considered along with the growing population of expatriates and the apparently increasing popularity of non-corporate business forms, courts will no doubt be confronted with applying the *Carden* rule and the "stateless" person doctrine in this context with increasing regularity.   Unless Congress takes up the problem and clarifies the meaning of  28 U.S.C. § 1332(a),

35

persons suing large partnerships will increasingly be barred from bringing their claim in federal court. Hopefully, Congress will address this situation and put the *Carden* genie back in its jurisdictional bottle. However, that day is not yet here, and I therefore concur in this judgment.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 07-1706

_____

CLIFTON G. SWIGER

<u>Appellants</u>

v.

ALLEGHENY ENERGY, INC.,
ALLEGHENY ENERGY SUPPLY CO., LLC,
ALLEGHENY ENERGY SERVICES CORP., and
MORGAN, LEWIS & BOCKIUS, LLP

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 05-CV-5725)
District Judge: The Honorable J. Curtis Joyner

_____

Argued March 25, 2008

BEFORE:MCKEE, RENDELL and TASHIMA[1], <u>Circuit Judges,</u>

_____

**JUDGMENT**

_____

This cause came to be heard on the record from the United States District Court for

_____

[1]The Honorable A. Wallace Tashima, Senior United States Circuit Judge for the Ninth
Circuit, sitting by designation.

the Eastern District of Pennsylvania and was argued on March 25, 2008.

On consideration whereof, it is now hereby ORDERED and ADJUDGED that the

order of the District Court entered on February 5, 2007, be and the same hereby is

AFFIRMED.

All of the above in accordance with the opinion of this Court.


ATTEST:

/s/ Marcia M. Waldron
Clerk


DATED: August 25, 2008

# EXHIBIT B

1         IN THE DISTRICT COURT OF THE UNITED STATES
       FOR THE NORTHERN DISTRICT OF ILLINOIS

2                EASTERN DIVISION

3

MORGAN, LEWIS & BOCKIUS LLP,    )

4                        )
        Plaintiff,      )

5                        )
      -vs-          ) No. 08 CV 2748

6                        )
CITY OF EAST CHICAGO,       )

7                        )
        Defendant.      )

8

9

10        Deposition of CHARLES G. LUBAR via telephone, taken

11  before DONNA L. POLICICCHIO, C.S.R., and Notary Public,

12  pursuant to the Federal Rules of Civil Procedure for the

13  United States District Courts pertaining to the taking of

14  depositions, at 200 Russell Street, Eighth Floor,

15  Hammond, Indiana, commencing at 2:00 o'clock p.m., on the

16  19th day of August, 2008.

17

18

19

20

21

22

23

24

2

```
 1          There were present at the taking of this deposition

 2     the following counsel:

 3          Via telephone:
            UNGARETTI & HARRIS LLP by
 4          MS. TINA B. SOLIS and
            MR. SETH A. HORVATH
 5          3500 Three First National Plaza
            70 West Madison Street
 6          Chicago, Illinois  60602
            (312) 977-4400
 7
                 on behalf of the Plaintiff;
 8
            EICHHORN & EICHHORN LLP by
 9          MR. ROBERT J. FELDT
            200 Russell Street
10          Sixth Floor
            Hammond, Indiana  46320
11          (219) 931-0560

12               on behalf of the Defendant.

13                    * * * * * *

14

15

16

17

18

19

20

21

22

23

24
```

1    properly registered in the foreign jurisdiction.

2    There are many lawyers from foreign jurisdictions

3    that practice in the U.K. who have British passports.

4    It's not relevant.

5    BY MR. FELDT:

6        Q    What was the process that you had to go

7    through to become a naturalized United Kingdom

8    citizen?

9        MS. SOLIS:  Objection.  Go ahead, Mr. Lubar.

10       A    That I'm happy to answer.  We had to show a

11   permanent residency in the United Kingdom with no

12   present intention to leave, and you had to then show

13   that you were in good standing with the national

14   insurance position, your tax position, you were

15   self-sustaining, you needed references from prominent

16   people in the local jurisdiction who were U.K.

17   citizens, and I did that in 1992, I believe.

18   BY MR. FELDT:

19       Q    Did you have to take an oath?

20       A    Took an oath to the queen.

21       Q    Okay.  Do you recall what the oath was?

22       A    No.

23       Q    Did you get any kind of paperwork to show

24   that -- let me rephrase that question.

1      MS. SOLIS:  Objection.  I don't think he's

2    testified that there is anything in the property at

3    the apartment in New York yet.

4      MR. FELDT:  Fine.

5  BY MR. FELDT:

6      Q   Do you have personal property in the

7    apartment in New York?

8      A   Yes.

9      Q   Other than the personal or tangible property

10   that you have in the apartment in New York, do you

11   have any other personal property in the United

12   States?

13     A   No.

14     Q   Have you ever served in either the United

15   States military or any other country's military?

16     A   No.

17     Q   Just for the record, I want to make sure, you

18   are contending that as of -- you are contending that

19   you are domiciled in the United Kingdom and not in

20   the United States?

21     A   I live permanently in the United Kingdom.

22     Q   I'm sorry.  Did you say currently?

23     MS. SOLIS:  No.  He said permanently.

24     A   I have been living permanently in the United

1    Kingdom.

2    BY MR. FELDT:

3        Q    Now, I have three pieces of real property in

4    the documents that I'm familiar with.  One is a home

5    in London, one is an apartment in London, and the

6    other is the apartment in New York City.

7            Do you own any other pieces of real property

8    at this point other than those three?

9        A    No.

10        Q    Does your extended family have any sort of

11    home estate or large parcel of land, say more than an

12    acre, that's retained in the United States?

13        MS. SOLIS:  Objection.  I think that's wholly

14    irrelevant to Mr. Lubar's domicile and intent to

15    remain, but, Mr. Lubar, you can go ahead and answer

16    that.

17        A    I don't understand what you mean by extended

18    family.

19    BY MR. FELDT:

20        Q    Well, your mother, your grandparents that

21    have held property in the U.S., anything that you

22    either have an interest in through the family in

23    potentially a will or something of that nature.

24        MS. SOLIS:  Objection.  Now I think you have form

1                    the following:

2                        "Q   Does your extended family have

3                    any sort of home estate or large parcel

4                    of land, say more than an acre, that's

5                    retained in the United States?")

6        MS. SOLIS:  Same objection.

7    BY MR. FELDT:

8        Q   Do you understand that question?

9        A   I will answer the question this way.  My

10   mother has a flat in Florida; my mother has a flat in

11   Rockville, Maryland.

12       Q   By flat do you mean an apartment or a

13   condominium?

14       A   An apartment in which she lives.

15       Q   All right.  Can you briefly summarize your

16   job history before you started with Morgan Lewis?

17       A   I left the United States in 1969.  I moved to

18   Nairobi, Kenya, where I ran a business with an

19   African partner.  Worked also for a bank from time to

20   time in Uganda.  I left Kenya in 1971 and I moved to

21   London, England, where I have resided ever since.

22        Do you want more?

23       Q   When did you start working for Morgan Lewis?

24       A   I set up the London office of Morgan Lewis

1    March 1st, 1981.

2        Q    What did you do for a living between then and

3    1971?

4        A    I was a practicing lawyer in London.  I was

5    with another firm from 1971 to 1974.  I set up and

6    ran my own practice from 1974 to 1981 and I merged my

7    practice with Morgan Lewis.

8        Q    At the time of the merger, did you become a

9    partner of Morgan Lewis?

10       A    Yes.

11       Q    Did you have to sign an agreement of some

12   sort or a contract in order to become a partner of

13   Morgan Lewis at that time?

14       A    Yes.  I signed a partnership agreement.

15       Q    Did that partnership agreement define your

16   rights and obligations as a partner?

17       A    Generally, yes.

18       Q    Would you have been able to become a partner

19   of Morgan Lewis if you had refused to sign that

20   agreement?

21       A    I doubt it.

22       Q    Is that same agreement still in effect or has

23   it been amended or replaced in some fashion since

24   then?

1        A    It's been amended many times.

2        Q    And each time did you have to sign an amended

3    agreement in order to remain as a partner of Morgan

4    Lewis?

5        A    I don't recall the last time I signed a

6    partnership agreement.  I mean -- period.  I don't.

7    I'm currently a partner of Morgan Lewis.

8        Q    And is that because you signed a partnership

9    agreement and any subsequent amendments?

10        MS. SOLIS:  Objection.

11        A    I have no idea.  I'm a partner because the

12    partnership voted me in as a partner, and I've

13    remained a partner since 1981.

14    BY MR. FELDT:

15        Q    Would you agree with me that it is a

16    contractual relationship?

17        A    Yes, it's a partnership relationship.

18        Q    And that relationship is defined by the

19    contract which constitutes the partnership agreement?

20        MS. SOLIS:  Objection.  Mischaracterization of

21    his previous testimony.

22        MR. FELDT:  I'm not characterizing his previous

23    testimony at all.  I'm asking him a question.

24        MS. SOLIS:  Then I object to the form of it.

1        Q    Do you have any understanding given your

2    years as a partner whether there is a particular age

3    at which a partner is obligated to retire from Morgan

4    Lewis?

5        A    Obligated, no.  I'm 67 and I'm still a

6    full-time equity partner.  There are other partners

7    who are comparable in age who are still full-time

8    partners of the firm.

9        Q    Do you have any plans for retirement?

10       A    Not now, no.

11       Q    Do the terms of the partnership agreement

12   allow you to continue to work for Morgan Lewis no

13   matter what your age and health?

14       A    I didn't say that.

15       Q    I appreciate that.  It's a different

16   question.

17       A    There is no age -- mandatory age retirement.

18       Q    I know.  This is a different question.

19            Would you like it read back?

20   MS. SOLIS:  I would like it read back, please.

21            (From the record above, the reporter read

22            the following:

23            "Q    Do the terms of the partnership

24            agreement allow you to continue to work

1                    for Morgan Lewis no matter what your age

2                    and health?")

3          MS. SOLIS:  Just a second, Mr. Lubar.  I'm going

4     to make an objection on the record and put on the

5     record that Mr. Feldt tried to obtain the entire

6     partnership agreement and the amendments thereto in

7     this case.  Judge Pallmeyer specifically denied his

8     request for the production of the entire partnership

9     agreement and, rather, ordered that only the

10    signature pages of Mr. Lubar and Ms. Yano be

11    produced, so I have a real problem going into this

12    line of questioning unless and until Mr. Lubar

13    testifies that he has knowledge independent of

14    reading those agreements, because I think it delves

15    into an area that Judge Pallmeyer said did not need

16    to be gone into.

17                    Having made that objection, you can go

18    ahead, Mr. Lubar.

19         A    Well, I really have nothing to say.  There

20    are many partners who are over 65 who are practicing,

21    and the management of the firm discusses that --

22    those issues with the individual partner.  If the

23    partner is productive and wants to stay on and the

24    firm itself wants you to stay on, then you may stay

1    on.  As to health, obviously you have to be healthy

2    enough to practice, your head has to work well, you

3    have to be physically able to practice, and that

4    would normally be a requirement of any partnership

5    agreement, that you have to have the capacity to

6    carry on the profession where you've been asked to

7    provide services.

8    BY MR. FELDT:

9        Q    I want to ask you about the apartment in

10   New York.  I have, I believe, an address of 24 West

11   55th Street, Number 10B.

12              Is that the correct address for the

13   apartment in New York?

14       A    That's the correct address.

15       Q    I have also seen reference to a 17 West 54th

16   Street.

17              Are you familiar with that address?

18       A    That's the other side.  The apartment

19   building is really composed of two separate parts.

20   One is on 55th Street; the other one is on 54th

21   Street.

22       Q    Okay.  How long have you had that apartment?

23       A    That apartment I've had probably two years --

24   two or three years.

1    Q    Did you have another apartment in New York

2    before that?

3    A    Yes.  I had Apartment 10A.

4    Q    Same building?

5    A    The same building.

6    Q    How long did you have that one?

7    A    That was purchased in 1999, I believe.

8    Q    How about before 10A, did you have an

9    apartment in New York?

10    A    No.

11    Q    I have seen both a reference to mortgages and

12    to the apartment being leased.

13         Do you own or rent that apartment at the

14    present time?

15    A    Well, we own it as a co-op.  Maybe it's a

16    different term of art in the U.S. than in the U.K.,

17    but I own the shares of a cooperative apartment along

18    with my wife.

19    Q    Okay.  Is there anyone else besides you or

20    your wife that owns a share of the apartment?

21    A    No, but my son lives in the apartment.

22    Q    Has that been the way the ownership has been

23    set up for the two years or so that you've had this

24    apartment, this 10B?

1       A    That ownership was similar to the ownership

2   we had when we originally bought 10A.

3       Q    So since 1999, whether it's 10A or 10B, it's

4   always been owned by you and your wife?

5       A    That's correct.

6       Q    And how long has your son been living in 10B?

7       A    Six months or so.

8       Q    Since 1999, apart from your son being in 10B

9   for the last six months, has anyone else lived in 10A

10  or 10B?

11      A    No.

12      Q    Has anyone else from 1999 to the present used

13  10A or 10B besides you?

14  MS. SOLIS:  Objection.  Form.

15  THE WITNESS:  I can respond, Tina.

16  MS. SOLIS:  Okay.  If you understand it, go

17  ahead.

18      A    Friends and family from time to time have

19  stayed in the apartment.

20  BY MR. FELDT:

21      Q    Okay.  Family meaning --

22      A    Brothers, sisters, nephews.

23      Q    Okay.  Are you staying in 10B right now while

24  you're in New York?

1    A    I don't recall.  August 8th I think was the

2    day that I flew to the United States.

3    Q    Okay.  Did you take pen and paper or computer

4    keyboard to hand and type or write out anything that

5    is in this document or was it all prepared by someone

6    else?

7    A    It was prepared.  I made a correction in my

8    address.

9    Q    In Paragraph 4?

10    A    And I signed it.  That's correct.

11    Q    Just so we've got a clear record, the

12    correction you made is in Paragraph 4?

13    A    That's right.

14    Q    When you signed it, what did you mean by

15    "immediate" in Paragraphs 9 and 10?

16    A    I have no current plans to leave the U.K. and

17    no current plans to retire.

18    Q    Well, you've used the term "current."  By

19    that do you mean today?

20    A    That's what current means.

21    Q    Okay.  So when you used the word "immediate"

22    in Paragraphs 9 and 10, did you mean on August 8th,

23    2008?

24    MS. SOLIS:  I'm sorry.  I missed the last part of

1       that.

2           A    I'll explain it.

3       BY MR. FELDT:

4           Q    Go ahead.

5           A    Whether you describe it as immediate or

6       current, it doesn't matter.  What I might believe in

7       ten years or what I might do in my life in ten years

8       I couldn't speculate on, so to me the proper response

9       is I have no intention of retiring and I have no -- I

10      live in the United Kingdom.  I have no plans to live

11      anywhere else.

12          Q    Well, just so that I understand what you're

13      saying, you're not putting any temporal period on the

14      word "immediate" other than as of August 8, 2008?

15          MS. SOLIS:  Objection.  Now you are

16      mischaracterizing his testimony.

17          MR. FELDT:  I'm just asking him.

18          A    I gave my answer.

19      BY MR. FELDT:

20          Q    When you used the word "immediate" in

21      Paragraphs 9 and 10, were you thinking any farther

22      ahead other than August 8, 2008?

23          MS. SOLIS:  Objection.  Asked and answered.

24          A    If it would help you, it would be current in

39

1       the foreseeable future.

2       BY MR. FELDT:

3           Q   I'm just asking for what you meant by the

4       term.  Is that what you meant?

5           A   Well, you're asking for present intention,

6       and that was the present intention, no immediate

7       plans to leave the United Kingdom and certainly not

8       return to the United States to live on a permanent

9       basis.  That's out of the question.

10          Q   Why is it out of the question?

11          A   Because I may never return to the United

12      States, and if I go somewhere -- I may well go

13      somewhere else if I decide to retire and not stay in

14      the United Kingdom.

15          Q   And I'm asking why do you say you may never

16      return to the United States.  You must have some

17      reason for saying that.

18          A   Because you are trying to characterize me as

19      somehow returning to the United States and therefore

20      having a domicile in the United States, which is

21      simply incorrect.

22          Q   I'm just asking why.

23          MS. SOLIS:  And, Mr. Feldt, he just got done

24      telling you why, so I'm going to object as asked and

1   answered.  We're now asking the same question about

2   the eighth time, so if we can please move it along.

3       MR. FELDT:  I don't think so.  I'm trying to find

4   out his reason for not returning to the United

5   States.

6       MS. SOLIS:  He told you.  He said I may never

7   return to the United States.

8       MR. FELDT:  And I'm asking why not.

9       A   Because I'm happy living abroad and doing

10  what I'm doing.  Not everybody wants to return to the

11  United States who lives outside it.

12  BY MR. FELDT:

13      Q   I'm just asking the question.

14      A   You got an answer.

15      Q   I'm not passing judgment on anyone.  I'm just

16  asking the question.

17          Now, there are in the documents various bank

18  accounts listed.  Some of them are located -- I think

19  there is a SunTrust account that is a P.O. box in

20  Orlando, Florida, but the account itself may be in

21  the District of Columbia.

22      A   That's correct.

23      Q   Is that still current?

24      A   Yes.

```
 1        A    Correct.

 2        Q    And is that because many of your clients do

 3   business or have business in the United States?

 4        A    That's correct.  Some live in the United

 5   States and I do the work outside the United States

 6   for them.

 7        Q    And lastly, sir, when we were talking about

 8   Paragraphs 9 and 10 of your declaration, which was

 9   marked as Lubar Exhibit 1, do you recall that?

10        A    Yes.

11        Q    And do you recall the testimony over what

12   "immediate" or "current" means?

13        A    Yes.

14        Q    Let me just ask you a question.  As you sit

15   here today, do you have any plans to leave the United

16   Kingdom and return to the United States to live on a

17   permanent basis?

18        A    Definitely not.

19        Q    And as you sit here today, do you have any

20   plans to retire from the employment of Morgan Lewis?

21        A    No.

22        MS. SOLIS:  Thank you, sir.  That's all I have.

23        MR. FELDT:  Nothing further.  Are you going to

24   read it?
```