# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MORGAN, LEWIS & BOCKIUS LLP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 08-cv-2748** |
| | ) | |
| **CITY OF EAST CHICAGO,** | ) | **Judge: Rebecca R. Pallmeyer** |
| | ) | **Magistrate Judge:** |
| **Defendant.** | ) | **Sidney I. Schenkier** |

## SUPPLEMENTAL RESPONSE OF THE DEFENDANT, CITY OF EAST CHICAGO, IN OPPOSITION TO THE THE PLAINTIFF'S MOTION TO REMAND, [DE14]

The Defendant, City of East Chicago, ("East Chicago"), by its attorneys, Eichhorn & Eichhorn, LLP, states as follows for its Supplemental Response in opposition to the Plaintiff's Motion To Remand, [DE14,15, 28], per the Court's August 14, 2008 order, [DE47, 48]:

### I. INTRODUCTION

East Chicago removed this matter to the United States District Court for the Northern District of Illinois on May 12, 2008. [DE1-2, 6, 9] The Plaintiff, Morgan, Lewis & Bockius LLP, ("Morgan Lewis"), filed a Motion To Remand, ("motion"), on June 5, 2008. [DE14] Morgan Lewis failed to support its motion with affidavits or other testimony from either of the two relevant witnesses asserted in the motion, Mr. Charles Lubar and Ms. Lisa Yano. [DE14, 15] The Plaintiff also objected to producing either of those witnesses for deposition. [DE25, Exhibit C] After initially granting that objection, the Court ordered the Plaintiff to provide Affidavits from Mr. Lubar and Ms. Yano, [DE42, ¶ 4], and thereafter overruled the Plaintiff's objection and allowed East Chicago to cross-examine these two witnesses in depositions. [DE47] The Court further allowed East Chicago to supplement its Response, and Morgan Lewis also tendered additional materials. [DE47-51]

East Chicago deposed Mr. Lubar by telephone on August 19, 2008; he participated from his Morgan Lewis office in New York City. (See attached Exhibit A, portions of the transcript of the deposition of Mr. Charles Lubar, p. 5.) The deposition of Ms. Yano was scheduled to proceed by agreement on August 25, 2008. [DE51, Exhibit B, communications between the parties and Yano deposition notice and subpoena.] The Plaintiff changed its mind on August 22, 2008 and objected to proceeding with Ms. Yano's deposition telephonically, but then withdrew Ms. Yano as a basis for removal in order to avoid the obligation to make her available for deposition. [DE49][1]

Morgan Lewis now raises only one argument as a basis for finding that this Court lacks subject matter jurisdiction: that Mr. Lubar is a dual citizen of the United States and the United Kingdom whose alleged place of domicile in the United Kingdom avoids 28 U.S.C. §1332(a). [DE14, 15, 49] This argument misses the point and ignores binding legal precedent. For even if the evidence as to Mr. Lubar is construed in the fashion which Morgan Lewis urges, subject matter jurisdiction still exists pursuant to 28 U.S.C. §1332(a)(3) and (a)(2)[2] because then Mr. Lubar's dominant nationality would be that of a citizen of the United Kingdom. *See, Sadat v. Mertes,* 615

---

[1]In the other case in which Morgan Lewis was a party, *Swiger v. Allegheny Energy, Inc.,* Cause No. 05-cv-5725 in the United States District Court for the Eastern District of Pennsylvania, Morgan Lewis also withdrew two persons and it lost as to a third. (See attached Exhibit B, 2/5/07 Memorandum and Order, pp. 3 and 11.) The district court in *Swiger* ordered relevant discovery to proceed for approximately one and one half years. (See attached Exhibit B, p. 3.)

[2]East Chicago believes that §1332(a)(3) is more appropriate here because Morgan Lewis remains a citizen of each of the States in which one of its partners is domiciled even if Mr. Lubar is domiciled in the United Kingdom. [DE28, generally] Section (a)(2) has been referenced, however, because Morgan Lewis urges that the Court define it by Mr. Lubar despite the fact that more than four hundred of its other partners are domiciled in one of the Fifty (50) States. (See [DE28, generally] and Sections II.A. & B. of this Supplemental Response) Also, *Sadat* has been often cited for its analysis of dual nationality, many times inaccurately, (see Sections II.A & B. of this Supplemental Response), but it has never been overturned by the Supreme Court or the Seventh Circuit, including its "effective and dominant nationality" test.

F.2d 1176, 1186-1188 (7th Cir. 1980), (applying an "effective and dominant nationality" test to determine if an individual dual national satisfied alienage jurisdiction under 28 U.S.C. 1332(a)(2).) Morgan Lewis' recent filing, [DE49], in fact, underscores this point.

## II.  DISCUSSION

### A.  Subject Matter Jurisdiction Is Proper Under 28 U.S.C. §1332(a)(1)-(3)

A simple three-step test exists as a result to determine under 28 U.S.C. §1332(a)(1) if a controversy is between citizens of different States: 1) determine if the plaintiff and defendant are both U.S. citizens; 2) determine if the plaintiff and defendant are both citizens of one or more of the fifty (50) States; and 3) if 1) and 2) are satisfied, determine if there are any overlapping States. *See, Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989); *Sadat v. Mertes,* 615 F.2d 1176, 1180 (7th Cir. 1980)*.* As a partnership, the Plaintiff's citizenship is determined by consulting the citizenship of its partners. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990), (finding that the parties were not diverse because one of the defendant's limited partners, like the plaintiff, was a citizen of the State of Louisiana); *Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992 (7th Cir. 2007) ("For diversity jurisdiction purposes, the citizenship of an LLC is *the citizenship of each of its members.*"), *(emphasis added)*; *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 881, n. 1 (7th Cir. 2004), ("[F]or diversity purposes, 'limited liability companies are citizens *of every state of which any member is a citizen.*'"), (*emphasis added, and citing to Belleville Catering Co. v. Champaign Mkt. Place, LLC*, 350 F.3d 691, 692 (7th Cir. 2003)). Morgan Lewis is a citizen of the States of Illinois, New York, California, New Jersey, Florida, Texas, Pennsylvania, Massachusetts and Minnesota by virtue of the fact that various partners in its numerous offices in those States are domiciled in those States. [DE28, Exhibit A, pp. 18, 22-24] (See, also, [DE1, Amended Exhibit C].)

East Chicago is a citizen of the State of Indiana by virtue of its status as an Indiana municipal corporation. [DE1, Exhibit A, ¶10] *People of the State of Illinois v. Kerr-McGee Chemical Corp.*, 677 F.2d 571, 577, fn. 13 (7th Cir. 1982). Morgan Lewis concedes that neither it nor any of its partners is a citizen of the State of Indiana. [DE28, Exhibit B, Admission Response Nos. 1-2]

Instead, Morgan Lewis contorts the second prong here, to argue that Mr. Lubar is "State-less" due to his alleged place of domicile in the United Kingdom and that he then makes the entire partnership as "State-less," destroying subject matter jurisdiction. But Morgan Lewis has the State citizenship test, backwards; once there is positive evidence of a partner who is a citizen of one of the fifty (50) States, and that any such partner is diverse from the opposing party, an alleged "stateless" partner becomes irrelevant. Such an interpretation of 28 U.S.C. §1332(a)(1) to apply the "completeness" rule to determining a collective entity's State citizenship as Morgan Lewis asserts should come from Congress, or at least from a clear, binding holding from the Supreme Court or the Seventh Circuit.[3]

This point was demonstrated recently by the Supreme Court in *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 568-569 (2004). In *Grupo Dataflux*, the Supreme Court rejected the notion that any one partner defines a partnership's citizenship:

> Because Atlas had two partners who were Mexican citizens at the time of filing, the partnership was a Mexican Citizen. (It also was a citizen of Delaware and Texas based on the citizenship of other partners.) And because the defendant, Dataflux, was

---

[3]Unless Mr. Lubar is established as a partner by contractual agreement as of May 12, 2008, he is irrelevant to this Court's subject matter jurisdiction. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990). The term "partnership" may be defined differently among organizations and entities, and East Chicago has been denied all opportunity to examine and address the actual terms of the contractual agreement which is the basis for Morgan Lewis' claim that this Court is without subject matter jurisdiction. [DE28, Exhibit A, pp. 25-27] (See, also, attached Exhibit A, pp. 21, 23.)

a Mexican corporation, aliens were on both sides of the case, and the requisite
diversity was therefore absent.

*Grupo Dataflux,* 541 U.S. at 569. The court further clarified that, while the court "looks to" the

citizenship of all of the partners to determine the partnership's citizenship, the partnership remains

the party, and not the individuals, for purposes of the determination if all plaintiffs are diverse from

all defendants. *Grupo Dataflux,* 541 U.S. at 578-580. Otherwise, the dismissal of the Mexican

partners should have been able to cure the defect and the Supreme Court held that it did not.

Apart from these authorities, Morgan Lewis' argument as to Mr. Lubar fails for other reasons.

First, the Seventh Circuit has noted that a person's intent is highly relevant to determining his or her

domicile, and "intent is a state of mind which must be evaluated through the circumstantial evidence

of a person's manifested conduct." *Sadat*, 615 F.2d at 1181. No testimony whatsoever from Mr.

Lubar was placed before the Court until August 11, 2008, [DE42, Exhibit B], and East Chicago was

not permitted any cross-examination of him until August 19, 2008. [DE51]; (See, also, attached

Exhibit A.) Prior to that time, East Chicago was able to show through his passport documents he has

been to New York, where he maintains a residence, numerous times in 2008 and 2007. [DE28,

Exhibit C, Response to Production No. 3, and Exhibit D, Restricted And Sealed Document:

documents produced by the Plaintiff, ML 38-40, 48, 49, 50, 51, 53, 54, 58, 59, 61, 63, 68, 90-91,

101-102] He was even in New York on May 11, 2008, the day before East Chicago filed its Notice

of Removal. [DE28, Exhibit C, Response to Production No. 3, and Exhibit D, Restricted And Sealed

Document: documents produced by the Plaintiff, ML 38-40, 48, 49, 50, 51, 53, 54, 58, 59, 61, 63,

68, 90-91, 101-102] East Chicago was finally able to expand upon this information in Mr. Lubar's

deposition; he has continued to consistently live and work in New York for several years. (See

attached Exhibit A, pp. 8-9, 27-32, 34-35, 42, 51.) He also has family, friends and clients in the

United States and maintains other professional connections here. (See attached Exhibit A, pp. 8-9,

27-32, 34-35, 42, 51.)

Mr. Lubar's August 11, 2008 Affidavit provided sparse facts relevant to establishing Mr.

Lubar's domicile. Citizenship is synonymous with domicile, which is defined as a person's "true,

fixed, and permanent home and place of habitation." *Vlandis v. Kline*, 412 U.S. 441, 454 (1973).

> [E]ach individual case must be decided on its own particular facts. In reviewing a
> claim, relevant criteria include year-round residence, voter registration, place of filing
> tax returns, property ownership, driver's license, car registration, marital status,
> vacation employment, etc.

Mr. Lubar's Affidavit referenced his "residences," but residence is not the correct inquiry – domicile

is. *Steigleder v. McQuesten*, 198 U.S. 141 (1905). Further, statements providing that Mr. Lubar

"live[s] with his family," and has a "primary residence" in London, (as compared to his other

residence in New York), do not suffice to explain his domiciliary status. [DE42, ¶¶ 7, 8] Mr. Lubar

also made no effort in his Affidavit to explain his predominant nationality, *Sadat,* 615 F.2d at 1186-

1188, where he merely stated he "was born in the United States and [is] a United States Citizen. [He

was] also a naturalized citizen of the United Kingdom." [DE42, ¶ 2] Finally, Mr. Lubar's "immediate

plans" to stay in the United Kingdom and remain "employed" with the Plaintiff do not establish his

intentions as of May 12, 2008. [DE42-3, ¶¶ 9, 10] May 12, 2008 is the only legally relevant date for

analysis, *Sadat,* 615 F.2d at 1180, but Mr. Lubar failed entirely to account for his intentions as of that

date. His testimony instead refers to the time of his Affidavit and deposition testimony, provided

after weeks of litigation. (See attached Exhibit A, pp. 37, 51.)

Morgan Lewis ignores this defect and apparently feels that the testimony which he provided at his deposition – testimony which he could have provided long ago, or at least in this Affidavit – fills in the missing blanks. [DE49] If the Court assesses the record as Morgan Lewis urges, however, the basis for subject matter jurisdiction simply shifts to 28 U.S.C. §1332(a)(3)/(2), (see fn. no. 1 of this Supplemental Response), because Morgan Lewis cannot now argue that the United Kingdom is not Mr. Lubar's dominant nationality. *See, Sadat,* 615 F.2d at 1186-1188. Mr. Lubar states himself that he considers his contacts with the United Kingdom to be far greater than his contacts with the United States. (See attached Exhibit A, pp. 14, 49.)

In *Sadat,* an individual naturalized U.S. citizen demonstrated that he retained his Egyptian citizenship and, therefore, was a dual national. *Sadat,* 615 F.2d at 1182-1184. Once dual nationality was established in *Sadat,* the Seventh Circuit did not ignore Sadat's Egyptian citizenship, as Morgan Lewis asks this Court to do with regard to Mr. Lubar's undisputed United Kingdom citizenship. To the contrary, the court undertook an analysis of the facts to determine if Egypt was Sadat's dominant nationality for purposes of finding subject matter jurisdiction under 28 U.S.C. §1332(a)(2). *Sadat,* 615 F.2d at 1181-1188. The court explained,

> Thus, the issue squarely presented to this court is whether a person possessing dual nationality, one of which is United States citizenship, [FN9] is 'a citizen or subject of a foreign state' under 28 U.S.C. s. 1332(a)(2)

*Sadat,* 615 F.2d at 1184. The court then held that "effective or dominant nationality" is a recognized exception under international law to the general rule of non-responsibility for conduct affecting dual nationals. *Sadat,* 615 F.2d at 1187. The court ultimately rejected subject matter jurisdiction under 28 U.S.C. §1332(a)(2) only because Sadat's Egyptian nationality was not dominant at the time of filing. *Sadat,* 615 F.2d at 1186-1188. While Sadat may have failed the "effective or dominant

nationality" test, Morgan Lewis' own contentions demonstrate that Mr. Lubar passes the test. The United Kingdom is Mr. Lubar's dominant nationality, thereby making him a citizen of a foreign state under 28 U.S.C. §1332(a)(2). [DE14, 15, 49] (See, also, attached Exhibit A, pp. 14, 49.)

In its Memorandum of Law in support of its motion, Morgan Lewis misstates a quote from *Sadat* to assert that only U.S. citizenship is relevant by omitting the word "ordinarily" from the quote. *Sadat,* 615 F.2d at 1187, (". . .that *ordinarily*, as the district court held, only the American nationality of the dual citizen should be recognized under 28 U.S.C. §1332(a).") [DE15, p. 6.] Likewise, Morgan Lewis ignores *Sadat's* recognition and application of the "effective and dominant nationality" test. This same error is repeated in the other cases upon which Morgan Lewis relies. [DE15, p. 6] For instance, the Southern District of New York noted in *Lehman Government Securities v. Pickholz,* 1996 WL 447995, p. 2 (S.D.N.Y. 1996), that Second Circuit law differed from Seventh Circuit law. This is because, while *Acton, S.A. v. Marc Rich & Co.,* 951 F.2d 504 (2nd Cir. 1991) cited *Sadat,* (also incompletely by omitting the word "ordinarily"), *Action* did not adopt *Sadat's* "effective or dominant nationality" test. Conversely, other courts have followed *Sadat's* "effective or dominant nationality" test. *See, e.g., Soghanalian v. Soghanalian,* 693 F.Supp. 1091, 1094-1095 (S.D.Fla. 1988).

### B. The Swiger Opinion Is Not Consistent With Binding Precedent.

Morgan Lewis also now urges this Court to follow *Swiger v. Allegheny Energy, Inc.*, 2008 WL 3891589 (3rd Cir. 2008). Neither the Supreme Court nor the Seventh Circuit has held, however, that a partnership which was otherwise a Citizen of a State due to the State(s) of domicile of its other partners is rendered "State-less" because one allegedly "State-less" partner negates all of the other partners. In fact, such a holding violates *Carden*, 494 U.S. at 187, *Camico Mut. Ins. Co.*, 474 F.3d

8

at 992, and *Commonwealth Ins. Co..*, 398 F.3d at 881, n. 1, which all hold that a partnership's citizenship is determined by consulting the State of domicile of *each* of its partners, not just one or two. While all of the partners' place of domicile must be "consulted" to determine diversity, no single partner defines the partnership's citizenship status, nor does he or she erase the status of all of the other partners. *Carden*, 494 U.S. at 189-196, (one non-diverse partner can, however, prevent complete diversity.) *See*, *also*, *Grupo Dataflux*, 541 U.S. at 569, 574-575, 579. For these and other reasons, the Third Circuit opinion in *Swiger* must be rejected.

Judge McKee's concurring opinion is actually quite startling and reflects some of the comments made by this Court on July 31, 2008 about the state of the applicable law.[4] In joining with the majority in a misplaced sense of obligation, Judge McKee states that the court's opinion is not really supported by any Supreme Court or Third Circuit precedent. *Swiger*, 2008 WL 3891589, p. 5. It is the court's misapplication of *Carden* to require "completeness" to the inquiry of citizenship, rather than to a comparison of the named parties, which leads to this erroneous holding. The need for all partners to be diverse does not mean that all partners must be citizens because it is the parties, not the partners who are compared. *Grupo Dataflux*, 541 U.S. at 569, 574-575, 579. Judge McKee is right; the opinion is fraught with mis-cited authorities.

For example, the *Swiger* court misconstrues *ISI Int'l, Inc., v. Borden Ladner Gervais LLP*, 316 F.3d 731, 733 (7th Cir. 2003). The issue in *ISI Int'l* was whether the district court properly invoked *forum non conveniens* when it relegated a plaintiff to a Canadian forum to pursue its action against a Canadian law firm. In upholding the district court's application of *forum non conveniens*,

---

[4]East Chicago has ordered the July 31, 2008 transcript but has not yet received the same from the Court's reporter.

9

the Seventh Circuit Court of Appeals noted parenthetically in *dicta* that one of the defendant's law partners was a U.S. citizen domiciled in Canada who therefore was "stateless." *ISI Int'l,* 316 F.3d at 733. *ISI* involved a Canadian law firm, however, and there is nothing in the case to suggest that the law firm was a U.S. Citizen or that it had any other U.S. partner who was a Citizen of one of the fifty (50) States. That is certainly not the evidence here, and for these reasons *ISI Int'l* is irrelevant. *Swiger* likewise acknowledges *Grupo Dataflux*, but ignores the impact of its holding. (See Section II.A. of this Supplemental Response.) *See*, *Grupo Dataflux*, 541 U.S. at 569, 574-575, 579. Concurring Judge McKee understood this. *Swiger*, 2008 WL 3891589 at p. 7-8.[5]

The Third Circuit also is not consistent with the Seventh Circuit with regard to alienage jurisdiction. The court in *Swiger* rejected the application of 28 U.S.C. §1332(a)(2) because of its recent opinion in *Frett-Smith v. Vanterpool*, 511 F.3d 396 (3rd Cir. 2008). In holding that only American nationality is relevant for a dual national for the purpose of diversity, the court cited the very same cases which the Plaintiff cited in its Memorandum Of Law at page 6 which arise from a misquote from *Sadat. Frett-Smith*, 511 F.3d at 399. (See Section II.A. of this Supplemental Response.) *Frett-Smith* is clearly inconsistent with *Sadat* in this regard and this Court is bound by *Sadat*.

---

[5]"However, the presence of a 'stateless' partner in a partnership whose partners' citizenship is otherwise completely diverse from all plaintiffs should not summarily defeat the exercise of our jurisdiction. After all, it is the partnership, not the individual partners, who are the party to the action. *Accord*, *Grupo Dataflux*, 541 U.S. at 569, 574-576, 579.

....

"Lubar's residence in England makes him a jurisdictional nullity, and his citizenship should be treated that way for purposes of determining subject matter jurisdiction. *Carden* and *Grupo Dataflux* are not necessarily to the contrary. They merely hold that it is the citizenship of all the members of a partnership that must be examined, they say nothing about the lack of a partner's citizenship."

This case involves a Defendant American City which should not be deprived of the constitutional and statutory rights available to it in a federal forum without a clear basis in the holdings of the Supreme Court or the Seventh Circuit Court of Appeals. *Carden*, 494 U.S. at 187, *Camico Mut. Ins. Co.*, 474 F.3d at 992, and *Commonwealth Ins. Co..*, 398 F.3d at 881, n. 1. This Court should be governed in its decision by the plain language of Article III, Sec. 2 and 28 U.S.C. §1332(a)(1), coupled with the holdings in *Carden*, *Camico Mut. Ins. Co.* and *Commonwealth Ins. Co.* that a partnership is a citizen of each and every State in which one of its partners is domiciled, rather than another Circuit which misstates Seventh Circuit law and which by its own reached an ill-reasoned conclusion to the contrary.

### C. Morgan Lewis' Request For Fees Still Has No Merit.

Morgan Lewis misstated the standard for awarding attorney fees upon remand in its original Memorandum Of Law. ("Where a case is wrongfully removed, and the removing party is made aware of the operative facts and law that compel returning the case to state court, an award of attorney's fees for bringing the motion is appropriate.") [DE15-1, p.8] To the contrary, the Supreme Court has held that, absent unusual circumstances, attorney fees may be awarded only where the removing party lacks an objectively reasonable basis for seeking the removal at the time a notice of removal is filed. *Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005); 28 U.S.C. § 1447(c); *see, also, Lott v. Pfizer, Inc.*, 492 F.3d 789, 793 (7th Cir. 2007), (holding that the district court erred in granting the plaintiff attorney fees and costs where the defendant had an objectively reasonable basis for seeking removal to federal court.) Apart from the fact that there is no basis for remand, Morgan Lewis has admitted that East Chicago had an objectively reasonable basis for seeking removal as of May 12, 2008. [DE28, Exhibit E, "Mr. Lubar's status as a U.S. citizen domiciled abroad is a

11

jurisdictional nuance specific to Morgan Lewis that *you could not reasonably have foreseen*." *(Emphasis added.)*] (See, also, [DE28] and Sections II.A. & B. of this Supplemental Response.) There is no basis for awarding attorneys fees to Morgan Lewis and the events since Morgan Lewis filed its motion make that fact even more obvious.

What Morgan Lewis is really arguing is that it should be awarded fees because East Chicago has had the temerity to question the factual and legal underpinnings of its motion and instead should have simply given up. That is not a legitimate basis for awarding fees in the first place, *Martin,* 546 U.S. at 141; *Lott,* 492 F.3d at 793, and none of the cases which it has cited support its request for fees. Moreover, the motion to remand was never properly supported in the first place; Morgan Lewis failed to support its motion with affidavits or other testimony from either of the two relevant witnesses asserted in the motion and the Court ordered the Plaintiff to provide Affidavits from them. [DE14, 15, 42, ¶ 4] Thereafter, the Court recognized not only East Chicago's right to cross-examine these two witnesses, but also and stated its concern regarding the reasoning behind the law.

**D. Denial Of The Motion To Remand Provides The Best Avenue For Clarification By The Seventh Circuit.**

There is a disparity with regard to the right of plaintiffs and defendants to appeal these types of issues. If a plaintiff's case is dismissed, he or she can appeal a final order. However, "[a]n order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise. . ." 28 U.S.C. §1447(d). An award of attorney's fees pursuant to 28 U.S.C. §1447(c) is reviewable on appeal, including the propriety of the remand. *Hart v. Wal-Mart Stores, Inc. Associates' Health And Welfare Plan,* 360 F.3d 674, 677 (7th Cir. 2004), *citing, Sirotsky v. New York Stock Exch.,* 347 F.3d 985, 987 (7th Cir. 2003), ("Plaintiff must show the remand order was correct.

. .") and *Moore v. Permanente Med. Group*, 981 F2d 443, 447 (9 Cir. 1992) ("[S]ome evaluation of the merits of the remand order is necessary to review an award of attorney's fees. . .".) But in such an appeal, an erroneous remand will be left undisturbed, at least at this time. *Hart*, 360 F.3d at 677.

For this reason, the best avenue for appeal in order to obtain clear precedent from the Seventh Circuit is to deny remand and certify an interlocutory appeal. According to 28 U.S.C. §1292(b),

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals, which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

This case presents an issue of first impression within the Seventh Circuit, and definitive precedent would provide clarity in an area currently occupied by uncertainty and confusion. The question of whether a large, multinational limited liability partnership, (or LLC, LP, or partnership, for that matter), should be deemed "State-less" as a whole on account of one allegedly "State-less" individual begs for appellate review in this Circuit, as well as a further opportunity to expound upon *Sadat*. Large, multinational law firms and other limited liability entities, like Morgan Lewis, are now commonplace in our society – a development that has evolved rapidly in a relatively short time frame. Therefore, final resolution of questions regarding a dual national's affect on the citizenship of a large business entity will afford future plaintiffs and defendants the chance to resolve questions and exercise reasoned, informed legal decision-making prior to attempting removal or remand. A

judgment from this Court that denies remand is the only outcome that could allow the Seventh Circuit latitude to both review the issues involved herein and rule on this case.

### III.  CONCLUSION

For all of the reasons stated herein and in East Chicago's original Response, [DE28], subject matter jurisdiction is proper under either 28 U.S.C. §1332(a)(1), (a)(2) or (a)(3). The Court should deny the Plaintiff's Motion To Remand, [DE14], in its entirety.

WHEREFORE, the Defendant, City of East Chicago, requests that the Court enter an order which denies the Plaintiff's Motion To Remand in its entirety.

Respectfully submitted,

**EICHHORN & EICHHORN, LLP**


By: s/Robert J. Feldt
    One of the attorneys for the Defendant,
    City of East Chicago

David C. Jensen
Robert J. Feldt
**EICHHORN & EICHHORN, LLP**
200 Russell Street
P.O. Box 6328
Hammond, IN 46325
219-931-0560

## CERTIFICATE OF SERVICE

I, Robert J. Feldt, hereby certify that on the __27th__ day of August, 2008, I electronically filed

the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such

filing to the following:

F. Thomas Hecht
Tina B. Solis
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, IL 60602
fthecht@uhlaw.com
tbsolis@uhlaw.com

 s/Robert J. Feldt_____
Robert J. Feldt

# EXHIBIT A

1              IN THE DISTRICT COURT OF THE UNITED STATES
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3

       MORGAN, LEWIS & BOCKIUS LLP,      )
4                                        )
                       Plaintiff,        )
5                                        )
                   -vs-                  )  No. 08 CV 2748
6                                        )
       CITY OF EAST CHICAGO,             )
7                                        )
                       Defendant.        )
8

9

10             Deposition of CHARLES G. LUBAR via telephone, taken

11     before DONNA L. POLICICCHIO, C.S.R., and Notary Public,

12     pursuant to the Federal Rules of Civil Procedure for the

13     United States District Courts pertaining to the taking of

14     depositions, at 200 Russell Street, Eighth Floor,

15     Hammond, Indiana, commencing at 2:00 o'clock p.m., on the

16     19th day of August, 2008.

17

18

19

20

21

22

23                                          DEFENDANT'S
                                            EXHIBIT
24                                          A

1                        CHARLES G. LUBAR,

2      called as a witness herein, having been first duly

3      sworn, was examined upon oral interrogatories and

4      testified as follows:

5                           EXAMINATION

6      BY MR. FELDT:

7          Q   Sir, could you state and spell your name for

8      the record, please?

9          A   Charles Gordon Lubar, L-U-B-A-R.

10         Q   Mr. Lubar, where are you located right now?

11         A   I'm in my office in New York City.

12         Q   When you say your office, do you mean an

13     office of Morgan, Lewis & Bockius LLP?

14         A   That's correct.

15         Q   Okay.  What's the address there?

16         A   101 Park Avenue.

17         Q   All right.  Have you ever given a deposition

18     before?

19         A   Yes.

20         Q   Do you know how many times?

21         A   No, not really.  Maybe several, I think.

22         Q   Okay.  Do you also take depositions in your

23     practice?

24         A   No.  I am not a litigator.

1      MR. FELDT:  Okay.  That's fine.  I wasn't trying

2  to imply that I sent them myself.  Okay.

3          We're ready then?

4      MS. SOLIS:  I believe so, and I would just like

5  to make a statement for the record.  Given that we're

6  doing this telephonically, Mr. Lubar, if you can

7  listen to the question and then wait a second or two

8  before you respond, that will give me time to

9  interpose my objections, given that you and I are not

10  sitting in the same room.

11          Is that fair?

12      THE WITNESS:  Sure.

13      MS. SOLIS:  Thank you.

14      MR. FELDT:  Fine by me.

15  BY MR. FELDT:

16      Q   Sir, what's your age as of today?

17      A   I'm 67 years old.

18      Q   And what's your date of birth?

19      A   May 20th, 1941.

20      Q   Where were you born?

21      A   Washington D.C.

22      Q   And did you grow up in Washington D.C.?

23      A   I grew up through high school in Washington

24  D.C.

```
1          Q    Are either of your parents living at this

2     point?

3          A    My father is no longer living.  My mother is

4     living.

5          Q    What is her name and where does she live?

6     I'm not looking for a street address.

7          A    Her name is Lenora Abrams, and she lives part

8     of the year in Rockville, Maryland, and the other

9     part of the year in Palm Beach, Florida.

10         Q    Okay.  Do you have any brothers and sisters?

11         A    Yes.  I have two sisters.

12         Q    What are their names and where do they live?

13         A    One sister is Nancy Sommers.  She lives in

14    Bethesda, Maryland.

15         Q    And the other?

16         A    Joan Alvarez.  She lives in Portland, Oregon.

17         Q    Okay.  My understanding is you're married?

18         A    Yes, I am married.

19         Q    What's your wife's name?

20         A    Dominique Lubar.

21         Q    Is that your only marriage?

22         MS. SOLIS:  Objection.  Rob, I don't know what

23    that has to do with anything.  He's currently married

24    to Mrs. Lubar.
```

14

1     properly registered in the foreign jurisdiction.

2     There are many lawyers from foreign jurisdictions

3     that practice in the U.K. who have British passports.

4     It's not relevant.

5     BY MR. FELDT:

6         Q   What was the process that you had to go

7     through to become a naturalized United Kingdom

8     citizen?

9         MS. SOLIS:  Objection.  Go ahead, Mr. Lubar.

10        A   That I'm happy to answer.  We had to show a

11    permanent residency in the United Kingdom with no

12    present intention to leave, and you had to then show

13    that you were in good standing with the national

14    insurance position, your tax position, you were

15    self-sustaining, you needed references from prominent

16    people in the local jurisdiction who were U.K.

17    citizens, and I did that in 1992, I believe.

18    BY MR. FELDT:

19        Q   Did you have to take an oath?

20        A   Took an oath to the queen.

21        Q   Okay.  Do you recall what the oath was?

22        A   No.

23        Q   Did you get any kind of paperwork to show

24    that -- let me rephrase that question.

1     March 1st, 1981.

2          Q    What did you do for a living between then and

3     1971?

4          A    I was a practicing lawyer in London.  I was

5     with another firm from 1971 to 1974.  I set up and

6     ran my own practice from 1974 to 1981 and I merged my

7     practice with Morgan Lewis.

8          Q    At the time of the merger, did you become a

9     partner of Morgan Lewis?

10         A    Yes.

11         Q    Did you have to sign an agreement of some

12    sort or a contract in order to become a partner of

13    Morgan Lewis at that time?

14         A    Yes.  I signed a partnership agreement.

15         Q    Did that partnership agreement define your

16    rights and obligations as a partner?

17         A    Generally, yes.

18         Q    Would you have been able to become a partner

19    of Morgan Lewis if you had refused to sign that

20    agreement?

21         A    I doubt it.

22         Q    Is that same agreement still in effect or has

23    it been amended or replaced in some fashion since

24    then?

1      MR. FELDT:  Are you directing him not to answer?

2      MS. SOLIS:  Did I say that?  I just made my

3   objection for the record.

4          You can go ahead and answer, Mr. Lubar, to

5   the best of your ability, if you understand the

6   question.

7      A    I don't understand the question.  Repeat the

8   question, please.

9      MR. FELDT:  Read it back, please.

10         (From the record above, the reporter read

11            the following:

12              "Q   And that relationship is

13            defined by the contract which constitutes

14            the partnership agreement?")

15     MS. SOLIS:  Same objection.

16     THE WITNESS:  I would answer it this way.  The

17   partnership agreement defines the relationship you

18   have as a partner as amended by countless regulations

19   and practices that have grown up over time in the way

20   the firm runs its business.

21   BY MR. FELDT:

22     Q    Thank you.  Does Morgan Lewis have a

23   retirement policy?

24     MS. SOLIS:  Objection.  Form.  You can go ahead

1       on.  As to health, obviously you have to be healthy

2       enough to practice, your head has to work well, you

3       have to be physically able to practice, and that

4       would normally be a requirement of any partnership

5       agreement, that you have to have the capacity to

6       carry on the profession where you've been asked to

7       provide services.

8       BY MR. FELDT:

9           Q   I want to ask you about the apartment in

10      New York.  I have, I believe, an address of 24 West

11      55th Street, Number 10B.

12              Is that the correct address for the

13      apartment in New York?

14          A   That's the correct address.

15          Q   I have also seen reference to a 17 West 54th

16      Street.

17              Are you familiar with that address?

18          A   That's the other side.  The apartment

19      building is really composed of two separate parts.

20      One is on 55th Street; the other one is on 54th

21      Street.

22          Q   Okay.  How long have you had that apartment?

23          A   That apartment I've had probably two years --

24      two or three years.

1         Q    Did you have another apartment in New York

2    before that?

3         A    Yes.   I had Apartment 10A.

4         Q    Same building?

5         A    The same building.

6         Q    How long did you have that one?

7         A    That was purchased in 1999, I believe.

8         Q    How about before 10A, did you have an

9    apartment in New York?

10        A    No.

11        Q    I have seen both a reference to mortgages and

12   to the apartment being leased.

13             Do you own or rent that apartment at the

14   present time?

15        A    Well, we own it as a co-op.  Maybe it's a

16   different term of art in the U.S. than in the U.K.,

17   but I own the shares of a cooperative apartment along

18   with my wife.

19        Q    Okay.  Is there anyone else besides you or

20   your wife that owns a share of the apartment?

21        A    No, but my son lives in the apartment.

22        Q    Has that been the way the ownership has been

23   set up for the two years or so that you've had this

24   apartment, this 10B?

```
 1          A    That ownership was similar to the ownership

 2    we had when we originally bought 10A.

 3          Q    So since 1999, whether it's 10A or 10B, it's

 4    always been owned by you and your wife?

 5          A    That's correct.

 6          Q    And how long has your son been living in 10B?

 7          A    Six months or so.

 8          Q    Since 1999, apart from your son being in 10B

 9    for the last six months, has anyone else lived in 10A

10    or 10B?

11          A    No.

12          Q    Has anyone else from 1999 to the present used

13    10A or 10B besides you?

14          MS. SOLIS:  Objection.  Form.

15          THE WITNESS:  I can respond, Tina.

16          MS. SOLIS:  Okay.  If you understand it, go

17    ahead.

18          A    Friends and family from time to time have

19    stayed in the apartment.

20    BY MR. FELDT:

21          Q    Okay.  Family meaning --

22          A    Brothers, sisters, nephews.

23          Q    Okay.  Are you staying in 10B right now while

24    you're in New York?
```

1      A    Yes.

2      Q    When --

3      A    Part of the time.

4      Q    Okay.  For how long are you in New York right

5   now?

6      MS. SOLIS:  I'm sorry, Mr. Feldt.  You cut out.

7   BY MR. FELDT:

8      Q    For how long are you in New York right now?

9      A    I go back to London -- well, tomorrow I go to

10  Upstate New York to the home of friends of mine, and

11  Sunday I go back to London.

12     Q    Is this part of a business trip or is this

13  all personal?

14     A    It's a combination of vacation time and

15  business time in New York.

16     Q    Do you know how many times you've been in the

17  United States in the year 2008?

18     A    2008?  A couple of times.

19     Q    Each time that you've been in the United

20  States in the year 2008 have you stayed at least part

21  of the time at the 10B apartment?

22     A    Yes.

23     Q    On each of those occasions in 2008 when

24  you've been in the United States, have you at least

1    part of the time been working?

2        A    Most of the time I've been working.

3        Q    On those occasions when you've been in the

4    United States in 2008, have you worked out of the

5    New York office of Morgan, Lewis & Bockius LLP?

6        A    Yes.

7        Q    Anywhere else that you've worked out of when

8    you've been in the United States in 2008?

9        A    I'm sorry?

10        Q    I'm just asking, in the year 2008 when you've

11    been working within the United States, are there any

12    other locations where you have been working other

13    than the New York office of Morgan, Lewis & Bockius

14    LLP?

15        A    Yes.  I worked in the Washington office of

16    Morgan Lewis.

17        Q    Anywhere else?

18        A    Any other offices of Morgan Lewis, no.

19        Q    Any other locations whether an office or not

20    of Morgan and Lewis?

21    MS. SOLIS:  Objection.  I think that's overly

22    broad.  I mean, do you want him to identify if he

23    took a client to a restaurant?

24    MR. FELDT:  If he considers it work related.

```
 1          A    I have meetings all over the city or all over

 2     Washington, wherever I happen to be.

 3     BY MR. FELDT:

 4          Q    Okay.  That's fine.  And by the city you mean

 5     New York City?

 6          A    New York City or Washington D.C. or sometimes

 7     other parts of New York State.

 8          Q    Is that related to the state government in

 9     Albany?

10          A    Not at all.

11          Q    Okay.  What is it that takes you to Upstate

12     New York?

13          A    Home of friends and clients.

14          Q    The Apartment 10B, is it kept functioning at

15     all times with utilities, water?

16          A    Yes.

17          Q    And that's done through a management company?

18          A    Not really.  It just continues as the normal

19     utilities as long as either I or my wife or my son

20     pay the bills.

21          Q    All right.  Let me rephrase that then.  The

22     utilities and water are provided through the

23     building, and unless you direct them to shut off your

24     unit, your unit stays functional at all times?
```

1    all day here, so I think it's time to focus in on the

2    narrow issue and move this along.  I mean, are we

3    really going to go to Judge Pallmeyer with how the

4    electricity is conducted in the flat in New York?

5        MR. FELDT:  Well, part of the reason why this is

6    taking so long is because you're interfering.  The

7    point of the question --

8        MS. SOLIS:  I'm not interfering.  This is a

9    limited deposition.

10   BY MR. FELDT:

11       Q    The point of the question, and I'll be more

12   precise, so long as you do not tell anyone to shut

13   off the water or the utility to the apartment, those

14   all stay on at all times, is that correct, Mr. Lubar?

15       A    That's correct.

16       Q    All right.  Now, would you have traveled to

17   the United States in 2007 in a similar fashion in

18   2008 in terms of the number of times and purposes for

19   the trips?

20       A    I was in the United States in 2007.  It was

21   always on either business or some occasional vacation

22   time, again, similar to 2008, some in Upstate

23   New York, some in Long Island, and I believe some in

24   Washington D.C.

1      Q     Would that have been true in 2006 as well?

2      A     Same position in 2006.

3      Q     Has that really changed at all since you've

4   had the first apartment, 10A, in 1999 to the present?

5      A     Not a lot.  I have always throughout my

6   entire practice spent a lot of time traveling to

7   where clients are, and a reasonable number of those

8   clients are in the United States, but I travel many

9   other places as well.

10      Q     Do you have any way to quantify how much time

11   you have spent in the United States in 2008 or in

12   2007 or in 2006?

13      MS. SOLIS:  Objection.  Go ahead, Mr. Lubar.

14      A     Well, I would guess a few weeks in each of

15   those years.  We're not finished with 2008, but --

16   BY MR. FELDT:

17      Q     I understand that.

18      A     I would average a few weeks a year.  That's a

19   reasonable guess.

20      Q     We have marked your declaration as Lubar

21   Exhibit No. 1.  My understanding is that you have it

22   in front of you or you have it handy.

23      A     I'm not sure we have the same exhibit.

24      Q     And that's fine.  It has the case caption for

1      A    I don't recall.  August 8th I think was the

2  day that I flew to the United States.

3      Q    Okay.  Did you take pen and paper or computer

4  keyboard to hand and type or write out anything that

5  is in this document or was it all prepared by someone

6  else?

7      A    It was prepared.  I made a correction in my

8  address.

9      Q    In Paragraph 4?

10      A    And I signed it.  That's correct.

11      Q    Just so we've got a clear record, the

12  correction you made is in Paragraph 4?

13      A    That's right.

14      Q    When you signed it, what did you mean by

15  "immediate" in Paragraphs 9 and 10?

16      A    I have no current plans to leave the U.K. and

17  no current plans to retire.

18      Q    Well, you've used the term "current."  By

19  that do you mean today?

20      A    That's what current means.

21      Q    Okay.  So when you used the word "immediate"

22  in Paragraphs 9 and 10, did you mean on August 8th,

23  2008?

24      MS. SOLIS:  I'm sorry.  I missed the last part of

1    Did you pay state taxes anywhere in the United

2    States?

3        A    Well, the partnership doesn't pay taxes.

4    Individual partners pay taxes on their distributive

5    share.

6        Q    Right.  And I'm not talking about the

7    partnership.  I'm talking about did you pay taxes in

8    any state on your distributive share.

9        MS. SOLIS:  And that's what he's trying to answer

10   for you if you would listen.

11       A    The answer is no, I'm not a resident of any

12   state, so I wouldn't pay any -- I wouldn't file any

13   state tax return.

14   BY MR. FELDT:

15       Q    That's the answer.  All right.

16            Did you pay real estate taxes anywhere in

17   the United States in 2007?

18       A    In New York.

19       Q    And that is for the Apartment 10B?

20       A    Actually, I think you pay -- I think you pay

21   a pro rata share or you're charged a pro rata share

22   of the real estate taxes that are assessed on the

23   entity that owns the building.

24       Q    Okay.  And that's paid in New York?

1       Q    How long have you been doing that?

2       A    Since I was a citizen.

3       Q    Are we talking regularly?

4       A    Yes, regularly, and most recently within the

5    last few months, and that was not -- that was a local

6    election for the mayor of London.

7       Q    And Red Ken got voted out.  Is that the one

8    you're talking about?

9       A    Exactly right.  Good knowledge.  And I

10   certainly didn't vote for him.

11      Q    Are you still a member of any organizations

12   in the United States, whether it be --

13      A    Am I member of any organizations in the

14   United States?

15      Q    Right.  And I don't mean the Maryland Bar or

16   anything like that but any kind of a civic or church

17   or charitable organization.

18           Are you a member of any of those that are

19   located in the United States?

20      A    I am a member of the Yale Club of New York

21   and I am a nonresident member of Woodmont Country

22   Club in Washington D.C., Rockville, Maryland.

23      Q    Any others?

24      A    I can't think of any others.

 1        Q    How long have you been a member of the Yale

 2    Club of New York?

 3        A    Yes, I am a member of the Yale Club of

 4    New York.

 5        Q    How long?

 6        A    I'm sorry.  How long?

 7        Q    How long.  Sorry.  The phone may have cut

 8    out.  How long have you been a member?

 9        A    Probably 20 years, because the reason I

10    joined the Yale Club of New York is because it had

11    reciprocity with the Oxford and Cambridge Club in

12    London, and the Oxford and Cambridge Club was next to

13    my old office in London, and I wanted to use it.

14        Q    Out of ignorance I ask, does the Yale Club of

15    New York meet in New York?

16        A    I have no idea because I've never been to a

17    meeting.

18        Q    All right.

19        A    And to be honest, I'm trying to remember

20    which reciprocity it had.  It had reciprocity -- may

21    have had it with the Reform Club as well in London.

22    But, in any event, I didn't use it that much.  I

23    still don't use it that much.  But it was very

24    helpful in having reciprocity in what we call

1    Clubland in the St. James area of London where I had

2    my office for many years.

3        Q    How about the Woodmont Country Club, how long

4    have you been a member?

5        A    Fifty years.  I take that back.  I was a

6    junior member, and I continued the membership after

7    my father died.  My mother continued it, and I was

8    entitled to become a member, and I became a member,

9    and then when I left the United States in 1969, I

10   just kept a nonresidency membership.

11       Q    When is the last time you've actually been

12   there?

13       A    To the club?

14       Q    Yeah.

15       A    A couple of times in 2007.  I don't think

16   I've been there this year.  Maybe once.

17       Q    Are you a member of any organizations located

18   in the United Kingdom?

19       A    Yes.  I'm a member of the Yale Club of -- I

20   guess it's the United Kingdom.  I'm a member of the

21   Harvard Club of the United Kingdom, the Harvard Law

22   School Association.  I was a Fulbright Commission

23   member and I'm on an alumnae organization.  I sit on

24   one of the committees for the Royal Academy of Art.

1    And then, of course, I'm a member of some

2    professional organizations, including -- there is a

3    British Fiscal Association and there is the Law

4    Society, which you, I think, pretty automatically

5    become a member of if you're a registered foreign

6    lawyer.

7         Q    All of these organizations are located in the

8    United Kingdom?

9         A    They're all in London.

10         Q    Do you know if any of them are also located

11    in the United States?

12         A    Well --

13         Q    I mean, I can be intuitive -- I'm sorry.  I

14    was just going to say I can be intuitive about some

15    of them.  I assume that the Law Society does not also

16    operate in the United States, but I'm just --

17         A    The Harvard Club of New York operates in

18    New York.  The Harvard Club of London operates in

19    London.  Fulbright Commission is a complex one

20    because it emanates out of the central government,

21    but the United Kingdom United States commission

22    operates in London.

23         Q    I guess what I'm trying to find out is, for

24    example, with the Yale Club of the United Kingdom, is

1    it part of the same organization as the Yale Club of

2    New York and --

3        A    Definitely not.

4        Q    That's kind of what I was trying to get at.

5        A    Okay.

6        Q    Not affiliations but whether they're just all

7    the same organization and they're located in

8    different places.

9        A    No, not at all.

10       Q    All right.  Do you consider your citizenship

11   in the United Kingdom to be your primary citizenship?

12       A    I never thought about it.  I think they're

13   both parallel citizenships.

14       Q    Well, let me put it this way.  Do you

15   consider your connections to the United Kingdom to be

16   far greater than any connections you may have to the

17   United States?

18       A    Oh, yes, sure.

19       MR. FELDT:  I'll pass the witness.

20                          EXAMINATION

21   BY MS. SOLIS:

22       Q    Mr. Lubar, just a couple of questions.

23            When we were talking about Apartment 10A and

24   10B, do you recall that line of questioning?

1      A    Correct.

2      Q    And is that because many of your clients do

3  business or have business in the United States?

4      A    That's correct.   Some live in the United

5  States and I do the work outside the United States

6  for them.

7      Q    And lastly, sir, when we were talking about

8  Paragraphs 9 and 10 of your declaration, which was

9  marked as Lubar Exhibit 1, do you recall that?

10     A    Yes.

11     Q    And do you recall the testimony over what

12  "immediate" or "current" means?

13     A    Yes.

14     Q    Let me just ask you a question.  As you sit

15  here today, do you have any plans to leave the United

16  Kingdom and return to the United States to live on a

17  permanent basis?

18     A    Definitely not.

19     Q    And as you sit here today, do you have any

20  plans to retire from the employment of Morgan Lewis?

21     A    No.

22     MS. SOLIS:  Thank you, sir.  That's all I have.

23     MR. FELDT:  Nothing further.  Are you going to

24  read it?

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MORGAN, LEWIS & BOCKIUS LLP,   )
                                       )
           Plaintiff,       )
                                       )
      v.                   )     No. 08 CV 2748
                                       )     Judge Pallmeyer
CITY OF EAST CHICAGO,      )     Magistrate Judge Schenkier
                                       )
           Defendant.    )

## DECLARATION OF CHARLES G. LUBAR

I, Charles G. Lubar, declare and state as follows:

1.     I am a partner in the law firm of Morgan, Lewis & Bockius LLP ("Morgan Lewis").

2.     I was born in the United States and am a United States citizen. I also am a naturalized citizen of the United Kingdom.

3.     I have taken no steps to terminate my United States citizenship and do not intend to do so.

4.     Morgan Lewis has an office in London, United Kingdom, currently located at 5-10 St. Paul's Churchyard.

5.     I have been a partner resident in Morgan Lewis's London office since 1981.

6.     I have resided in the United Kingdom since 1971.

7.     I currently lease an apartment in London, located at 155 Sloane Street, and own a home in London, located at 36 Onslow Gardens. I also lease an apartment in New York, located at 24 West 55th Street. My home in London is my primary residence.

8.     I live with my family.



EXHIBIT
1
Lubar
8-19-08 DP

9.    I have no immediate plans to leave the United Kingdom and return to the
United States to live on a permanent basis.

10.    I have no immediate plans to retire from the employment of Morgan
Lewis.

11.    I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the
foregoing information is true and correct based upon my personal knowledge.

Dated: August 8, 2008

_____
Charles Lubar

1191919-1                                    2

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLIFTON G. SWIGER              : CIVIL ACTION
                               :
        vs.                    :
                               : NO. 05-CV-5725
ALLEGHENY ENERGY, INC.,        :
ALLEGHENY ENERGY SUPPLY CO.,   :
LLC, ALLEGHENY ENERGY SERVICE  :
CORP., and MORGAN, LEWIS &     :
BOCKIUS                        :

### MEMORANDUM AND ORDER

JOYNER, J.                              February 5, 2007

    This case is once again before the Court for disposition of Defendants' Renewed Motions to Dismiss for Lack of Jurisdiction. For the reasons outlined below, the motions shall be granted and Plaintiff's complaint shall be dismissed without prejudice and with leave to Plaintiff to re-file it in the appropriate court.

### History of the Case

_____As we previously discussed in our Memorandum and Order of May 18, 2006, this case arises out of an anonymous message which Plaintiff, Clifton Swiger, posted on the Yahoo! World Wide Web portal message board devoted to Allegheny Energy, his then-employer, on July 23, 2003. Mr. Swiger posted this message from his home computer on his own time, using his personal Yahoo! account and a nickname to conceal his true identity, although his message did indicate that he was a long-time, non-exempt



Plaintiff instituted this action on October 28, 2005 against the defendants under the state common law theories of abuse of process, wrongful use of civil proceedings, invasion of privacy and wrongful discharge.  Jurisdiction was based on diversity of citizenship.  Morgan Lewis moved to dismiss (and the Allegheny Energy defendants joined in that motion) on the grounds that because it had four partners[1] resident in the United Kingdom and Japan, it is not a citizen of *any* domestic or foreign state and thus is not subject to diversity jurisdiction under 28 U.S.C. §1332(a).  We stayed that motion and directed the parties to take jurisdictional discovery into the citizenship, residency and domicile of all of the Morgan Lewis partners who reside in foreign countries.  The parties have now completed that discovery and, after reviewing the evidence submitted, we now make the following:

### Findings of Fact

1.  Charles G. Lubar has been a partner in Morgan Lewis' office in London, United Kingdom since 1981.  From 1985 to 2005, Mr. Lubar resided at 82 Onslow Gardens, London, SW7; he owned

---

[1]  In its Memorandum of Law in Support of its Renewed Motion to Dismiss filed on October 3, 2006, Morgan Lewis states that it is no longer relying on Rachel Gonzalez to support its argument against diversity jurisdiction as she is no longer a partner with it.  (See p. 2, footnote 2 to Morgan Lewis' Memorandum of Law in Support of Renewed Motion to Dismiss).  Additionally, our recent review of Morgan Lewis' website reflects that John Sasaki is also no longer affiliated with Morgan Lewis.  Accordingly, we examine the citizenship/domiciles of only two Morgan Lewis partners--Gregory Salathe and Charles Lubar.

this one in that he owns and has owned several homes there, he votes there, has most of his financial assets there, has social and civic connections there and appears to possibly even have dual citizenship.  Although we would have preferred that the parties provide a more complete record in the form of deposition testimony on the matter of where the partners at issue are domiciled, the evidence before us strongly suggests that Mr. Lubar has no intention of ever again making the U.S. his home. We therefore find that Mr. Lubar is a domiciliary of London.

Mr. Salathe's ties to Japan are far more attenuated.  He has resided there for little more than three years and does not own his residence there.  He does not vote there, and most of his financial assets are held and/or managed in New York, using the Morgan Lewis' New York office address.  He voted in the 2004 U.S. Presidential election and his sole civic association is with the American Chamber of Commerce.  While it clearly appears that Tokyo is Mr. Salathe's present home, we cannot find the evidence before us to be sufficient to overcome the presumption that he remains a New York domiciliary who intends to at some point return to New York.

Given that for diversity purposes, the court must consult the citizenship of *all* of the members of an artificial entity such as a general or limited partnership and because a United States citizen who is not domiciled in one of the United States

11